# EXHIBIT 1

*(Summons and Complaint
dated June 19, 2014)*

FILED: WESTCHESTER COUNTY CLERK 06/19/2014
NYSCEF DOC. NO. 1

INDEX NO. 59638/2014
RECEIVED NYSCEF: 06/19/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER, COMMERCIAL DIVISION

JESSICA ZWEIMAN, Executrix of the Estate of Anne
Zweiman, on behalf of herself and all others similarly
situated,

Plaintiff,

Index No.

- against -

**SUMMONS**

AXA EQUITABLE LIFE INSURANCE COMPANY,

Defendant.

TO: **AXA EQUITABLE LIFE INSURANCE COMPANY**
**1290 Avenue of the Americas,**
**New York, NY 10104**

**YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorneys an

Answer to the Complaint in this action within twenty (20) days after service of this Summons,

exclusive of the day of service, or within thirty (30) days after service is complete, if this

Summons is not personally delivered to you within the State of New York.  In case of your

failure to answer, Judgment will be taken against you by default for the relief demanded in the

Complaint.

Dated: White Plains, NY
June 19, 2014

LOWEY DANNENBERG COHEN & HART, P.C.

By: _____
Barbara J. Hart
Thomas M. Skelton
David Harrison
One North Broadway, Suite 509
White Plains, NY  10601-2301
Telephone:  (914) 997-0500

{2660 / CMP / 00123337.DOCX v2}

HARWOOD FEFFER LLP
Joel C. Feffer
Samuel K. Rosen
James G. Flynn
488 Madison Avenue, 8th Floor
New York, New York 10022
Telephone:  (212) 935-7400

SHAPIRO HABER & URMY LLP
Edward F. Haber
Patrick J. Vallely
53 State Street
Boston, MA  02109
Telephone:  (617) 439-3939

*Attorneys for Plaintiff*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER, COMMERCIAL DIVISION

JESSICA ZWEIMAN, Executrix of the Estate of Anne
Zweiman, on behalf of herself and all others similarly
situated,

Plaintiff,

- against -

AXA EQUITABLE LIFE INSURANCE COMPANY,

Defendant.

Index No.

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff, by her attorneys, for her complaint, alleges upon knowledge as to her own acts and upon information and belief as to all other matters as follows:

**Summary**

1.     This breach-of-contract class action is brought due to defendant AXA Equitable Life Insurance Company's ("AXA") failure to comply with material terms in the variable deferred annuity policies held by plaintiff and all other members of the putative class defined below.  For the reasons set forth below, AXA breached express provisions of the contract by failing to comply with New York State law when it implemented a hedging strategy it describes as the AXA Tactical Manager Strategy ("ATM Strategy").

2.     Plaintiff brings this action as a class action on behalf of herself and all other similarly situated AXA variable annuity policyholders, as described herein.

**Parties**

3.      Plaintiff Jessica Zweiman is executrix of the estate of Anne Zweiman.  In October 2008, Anne Zweiman purchased a variable deferred annuity issued by AXA.  The policy is identified by AXA as policy number 3-08658884.

4.      Defendant AXA is organized under New York law with its principal place of business located at 1290 Avenue of the Americas, New York, New York 10104.  It is authorized to write life insurance, annuities, and accident and health insurance, and is licensed to transact business in all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands, and Canada.  AXA and its subsidiaries offer a broad portfolio of life insurance products, and a variety of annuity products, including fixed deferred annuities, payout annuities, and variable annuities.

**Venue**

5.      Venue is proper in this Court because AXA is organized under New York law, and many of the events and agreements described below either occurred in, or were entered into, this County.  In addition, plaintiff is a resident of this County.

**Substantive Allegations**

**A.      The Variable Annuities**

6.      AXA sells variable annuity products.  A variable annuity is a contract between the purchaser or "annuitant" and an insurance company, pursuant to which, among other things, the insurance company agrees to make periodic payments to the annuitant, beginning either immediately or at some future date.  The annuitant can purchase the variable annuity contract through either a single payment or a series of payments.

7.      Variable annuity products account for a majority of AXA's revenues representing over 70% (approximately $7.6 billion) of AXA's total premiums and deposits in 2009, and nearly 75% (approximately $9.6 billion) of total premiums and deposits by 2013 year end.

8.      According to the New York Department of Financial Services ("DFS") examination of AXA's financial condition at calendar year-end 2010, New York State accounted for the largest percentage of those premiums of all 50 states with a 13.2 percent market share.

9.      The policies purchased by plaintiff and other Class members (as hereinafter defined) permitted policyholders to acquire, for an additional premium, a guarantee that certain benefits will increase by a minimum percentage each year.  This, combined with policy reset provisions – which provide that the value of guaranteed benefits could only increase and never decrease, effectively immunized these benefits from the risks attendant to stock market volatility.

10.     Although the policies grant AXA some discretion over investment options, they do not allow AXA to materially change such investment options without complying with applicable law.  Additionally, the contract provides that AXA has established and maintains its "Separate Accounts" (as defined in the policies) in accordance with the laws of New York State and that AXA may, in its discretion, invest Separate Account assets in any investment permitted by applicable law.

**B.      Implementation of the ATM Strategy**

11.     Sometime between 2009 and 2011 – after plaintiff's purchase of the variable annuity – AXA began implementing the ATM Strategy for the sole purpose of reducing AXA's exposure to market volatility – the very risks policyholders paid AXA to assume in purchasing guaranteed benefits.

12.     The effects of the ATM Strategy, however, altered the very nature of the product held by plaintiff and other policyholders.   Implementation of the ATM Strategy materially changed the variable annuity products and reduced the value of plaintiff's and the other Class members' variable annuity accounts.

13.     In its contracts with plaintiff and the other members of the Class, AXA covenanted that it would comply with all applicable laws, including New York law.  As found by the DFS, which finding was consented to by AXA, AXA violated New York law in connection with its implementation of the ATM Strategy.  *See* Consent Order dated March 17, 2014, submitted herewith as Exhibit A.

14.     The ATM Strategy damaged plaintiff and the other Class members because the benefits to which they are entitled under the variable annuity policies have been improperly reduced.

15.     In fact, AXA has acknowledged that, during the period 2010 through 2012, there was a sharp divergence in performance between two equivalent investments that was attributable to the use of the ATM Strategy.   Specifically, the investment without the ATM Strategy generated approximately 11.5 percent higher returns during this period than the investment that utilized the ATM Strategy.  This represents an annualized differential of more than three percent.

### Class Action Allegations

16.     This action is brought as a class action, pursuant to CPLR 901 *et seq.*, on behalf of all persons who purchased variable annuities from AXA which subsequently became subject to the ATM Strategy, and who suffered injury as a result thereof (the "Class").

17.     This action is properly brought as a class action under Article 9 of the CPLR for the following reasons:

a.  Numerosity:  The Class consists of thousands of persons and is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.  Commonality: There are questions of law or fact common to the Class which predominate over any questions affecting only individual Class members, including:

i.  whether AXA breached its contractual obligations by violating New York law in implementing its ATM Strategy; and

ii.  whether the Class was injured and the basis upon which damages should be calculated to compensate for the injury.

c.  Typicality: The claims asserted by plaintiff are typical of the claims of the Class; and

d.  Adequacy: Plaintiff will fairly and adequately protect the interests of the Class and has retained attorneys experienced in class and complex litigation.  Plaintiff has no interest antagonistic to or in conflict with those of the Class.

e.  Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

i.  the logistics and financial burden of prosecuting an action on an individual basis are so great that a policyholder has little interest in prosecuting an individual action;

ii.  when the liability of defendant has been adjudicated, claims of all members of the Class can be determined by the Court;

      iii.      this action will result in an orderly and expeditious administration of the Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions; and

      iv.      this action presents no difficulties that would impede its management by the Court as a class action.

18.    Class action status is further warranted under CPLR § 901(a) because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### Cause of Action
### (Breach of Contract)

19.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

20.    AXA breached the terms of the variable deferred annuities held by plaintiff and the Class by implementing the ATM Strategy in violation of New York law.

21.    Plaintiff and the other Class members have performed all of their obligations under the variable annuity contracts.

22.    The ATM Strategy substantially reduced the benefits to which plaintiff and the other members of the Class are entitled under the terms of their contracts with AXA, and plaintiff and the members of the Class suffered damages as a result.

23.    AXA is liable for the damages sustained in an amount to be determined at trial.

### Jury Demand

24.    Plaintiff demands a trial by jury on all issues so triable.

WHEREFORE, plaintiff demands judgment against AXA as follows:

A.      determining that this action may proceed as a class action maintainable under CPLR § 901 on behalf of the Class;

B.      awarding plaintiff and the Class damages;

C.      awarding plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' fees, expert witness fees, and other costs; and

D.      granting such other and further relief as may be just and proper.

Dated: White Plains, New York
      June 19, 2014

                           LOWEY DANNENBERG COHEN & HART, P.C.

By:   _____
                         Barbara J. Hart
                         Thomas M. Skelton
                         David Harrison
                         One North Broadway, Suite 509
                         White Plains, NY  10601-2301
                         Telephone:  (914) 997-0500

                         HARWOOD FEFFER LLP
                         Joel C. Feffer
                         Samuel K. Rosen
                         James G. Flynn
                         488 Madison Avenue, 8th Floor
                         New York, New York 10022
                         Telephone:  (212) 935-7400

                         SHAPIRO HABER & URMY LLP
                         Edward F. Haber
                         Patrick J. Vallely
                         53 State Street
                         Boston, MA  02109
                         Telephone:  (617) 439-3939

                         *Attorneys for Plaintiff*

# EXHIBIT A

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
FINANCIAL FRAUD & CONSUMER PROTECTION DIVISION
------------------------------------------------------------------------------------X

In the Matter of

AXA Equitable Life Insurance Company,

                         Respondent.

------------------------------------------------------------------------------------X

## CONSENT ORDER

WHEREAS, in 2011, the New York State Department of Financial Services ("DFS" or "Department")[1] commenced an investigation, pursuant to the New York Insurance Law, of AXA Equitable Life Insurance Company ("AXA Equitable") concerning the implementation of the AXA Tactical Manager strategy ("ATM Strategy") in its Separate Accounts (as defined below) of existing policyholders (the "Investigation");

WHEREAS, DFS investigated whether AXA Equitable properly informed DFS regarding the implementation of the ATM Strategy to its variable annuity contracts, including but not limited to contracts with guaranteed benefits;

WHEREAS, the Investigation concluded that AXA Equitable failed to adequately inform DFS and DFS's predecessor, the New York State Insurance Department ("NYSID") that it was implementing its ATM Strategy in a manner that substantially changed its variable annuity products;

---

[1] DFS was created by transferring the functions of the New York State Banking Department and the New York State Insurance Department into a new agency.  This transfer of functions became effective on October 3, 2011.

WHEREAS, this Consent Order contains DFS's findings and the relief agreed to by DFS and AXA Equitable;

NOW, THEREFORE, DFS and AXA Equitable are willing to resolve the matters cited herein in lieu of proceeding by notice and a hearing.

## FINDINGS

DFS's findings of the Investigation ("Findings") are as follows:

## RELEVANT ENTITY

1.  AXA Equitable was founded in 1859 and is headquartered in New York, New York. It is a subsidiary of AXA Equitable Financial Services, LLC, which is located in New York, New York. AXA Equitable offers various life insurance products including term life, universal life, and variable universal life insurance products, as well as variable and fixed annuities, to New York residents and customers throughout the rest of the United States.

## FACTUAL BACKGROUND

### AXA Equitable's Omissions from the NYSID

2.  In 2009, 2010, and 2011, AXA Equitable filed with the NYSID and DFS requests to amend and restate the Plans of Operation for Separate Accounts A, 45, 49, 65, 66, 70, 206, 301, I, and FP (the "Separate Accounts") pursuant to New York Insurance Law

§ 4240(e).  Separate Accounts A, 45, and 49 are three of the accounts that contain AXA

Equitable's variable annuity accounts, including but not limited to those with guaranteed

benefits.[2]

3.    These filings, relating to the Plans of Operation, through which AXA Equitable

introduced the ATM Strategy through new funds and existing funds, failed to inform and

adequately explain to DFS the significance of the changes caused by introduction and

application of the ATM Strategy to existing policyholders.  For example, the filed

requests to amend and restate the Plans of Operation did not address how existing

policyholders who had not elected to invest in the ATM Strategy could end up invested in

such funds.

4.    The ATM Strategy is designed to smooth funds' returns during periods of high market

volatility.  The ATM Strategy uses derivatives to reduce funds' equity exposure.  AXA

Equitable offers in all of its Separate Accounts, some of which contain assets from AXA

Equitable's variable annuity policyholders with guaranteed benefits, investment options

that invest in funds that utilize the ATM Strategy.

5.    However, the application of the ATM Strategy may, especially during highly volatile

markets, limit the gains that may accrue to a policyholder's account without the ATM

Strategy.

6.    Many policyholders invested in variable annuities, including variable annuities with

guaranteed living and death benefits, because they were interested in making more

---

[2] A variable annuity is a tax-deferred retirement vehicle that allows the individual to choose from a selection of investments and then pays the individual a level of income in retirement that is determined by the performance of such investments.  The investment options are typically mutual funds that invest in stocks, bonds, money market instruments, or some combination thereof.  Variable annuities sometimes offer other features such as guaranteed benefits, which guarantee a particular minimum level of annuity payments even if the individual does not have enough money in the account (perhaps because of investment losses) to support that level of payments.

aggressive investments to capture market rises. These policyholders were comfortable taking such aggressive positions because they had purchased an annuity benefit guarantee that provided certain levels of benefits regardless of the performance of the selected investment options. Because such policyholders paid for a guarantee, they may have invested aggressively in hopes of increasing their account value and their income payments.

7.    In addition, the ATM Strategy may have the effect of suppressing the value of certain guarantee benefits that are eligible for periodic benefit base resets because the benefit base is only available for resets when the policyholder's account value rises.

8.    The changes effectively changed the nature of the product that the policyholders purchased, yet AXA did not explain in its filings to the Department that it was making such changes to its variable annuity products. The absence of detail and discussion in the filings regarding the significance of the implementation of the ATM Strategy had the effect of misleading the Department regarding the scope and potential effects of the ATM Strategy on the relevant funds and the possible consequences for policyholders.

9.    DFS approved the filings because it was led to believe that the changes were merely routine additions of funds and similar alterations. The Department approved the filings on that basis. Had the Department been aware of the extent of the changes, it may have required that the existing policyholders affirmatively opt in to the ATM Strategy.

## VIOLATIONS

10.  DFS finds that the foregoing acts and practices of AXA Equitable violate New York Insurance Law § 4240(e).

11.  AXA Equitable violated New York Insurance Law § 4240(e) by filing the Plans of Operation with the NYSID and DFS without adequately informing and explaining to the Department the significance of the changes to the insurance product.

## AGREEMENT

### I.   Civil Fine

12.  No later than April 1, 2014, AXA Equitable shall pay a civil fine pursuant to N.Y. Ins. Law § 109 in the amount of $20,000,000 to the New York State Department of Financial Services to address the foregoing conduct by AXA Equitable. The payment shall be in the form of a wire transfer in accordance with DFS instructions or a certified or bank check made payable "New York State Department of Financial Services" and mailed to: New York State Department of Financial Services, One State Street, New York, New York, 10004-1511, Attention: Joy Feigenbaum, Executive Deputy Superintendent, Financial Frauds & Consumer Protection.

### II.  Indemnification

13.  Neither AXA Equitable, nor any of its parents or affiliates shall, collectively or individually, seek or accept, directly or indirectly, reimbursement or indemnification, including, but not limited to, payment made pursuant to any insurance policy, with regard to any or all of the amounts payable pursuant to Section I of this Consent Order.

5

**III.**   **Other Relief**

14.   AXA Equitable agrees to seek all necessary approvals with regard to New York
Insurance Law § 4240(e), and will provide Department-approved communications to
policyholders when AXA Equitable is revising fund choices in connection with the ATM
Strategy, and comply with any other conditions placed on any such approvals.

15.   AXA Equitable will issue a written report to DFS concerning changes to the Plan of
Operations for Separate Accounts A, 45, and 49 and respond to the Department's
questions thereon on a quarterly basis for a period of five years from the date of this
agreement.

16.   AXA Equitable admits to the authority of DFS to effectuate this Consent Order.

**IV.**   **Breach of the Consent Order**

17.   In the event that DFS believes that AXA Equitable has materially breached this Consent
Order, DFS will provide written notice of such breach to AXA Equitable and AXA
Equitable must, within ten (10) business days from the date of receipt of said notice, or
on a later date if so determined in the sole discretion of DFS, appear before DFS and have
an opportunity to rebut the evidence, if any, on the issue of whether a breach has occurred
and, to the extent pertinent, to demonstrate that any such breach is not material or has
been cured.

**V.**   **Other Provisions**

18.   If AXA Equitable defaults on its monetary obligations under this Consent Order, DFS
may terminate this Consent Order, at its sole discretion, upon ten (10) days' written
notice to AXA Equitable.  In the event of such termination, AXA Equitable expressly
agrees and acknowledges that this Consent Order shall in no way bar or otherwise

6

preclude DFS from commencing, conducting, or prosecuting any investigation, action, or proceeding, however denominated, related to the Consent Order, against it, or from using in any way the statements, documents, or other materials produced or provided by AXA Equitable prior to or after the date of this Consent Order, including, without limitation, such statements, documents, or other materials, if any, provided for purposes of settlement negotiations, except as may otherwise be provided in a written agreement with DFS.

19.    DFS has agreed to the terms of this Consent Order based on, among other things, the representations made to DFS by AXA Equitable and/or its counsel in connection with DFS's Investigation and the Findings of the Investigation.  To the extent that representations made by AXA Equitable or its counsel are later found to be materially incomplete or inaccurate, this Consent Order is voidable by DFS in the Superintendent's sole discretion.

20.    AXA Equitable shall, upon request by DFS, provide all documentation and information reasonably necessary for DFS to verify compliance with this Consent Order.

21.    All notices, reports, requests, and other communications to any party pursuant to this Consent Order shall be in writing and shall be directed as follows:

If to DFS:

New York State Department of Financial Services
One State Street
New York, New York 10004-1511
Attention:  Christopher B. Mulvihill, Senior Counsel to the Superintendent,
Michael Maffei, Assistant Deputy Superintendent and Life Bureau Chief

If to AXA Equitable:

AXA Equitable Life Insurance Company
1290 Avenue of the Americas

New York, New York 10104
Attention: Kermitt Brooks, Managing Director and Associate General Counsel

with a copy to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attention: Eric R. Dinallo/Mark P. Goodman, Esqs.

22. This Consent Order and any dispute thereunder shall be governed by the laws of the State of New York without regard to any conflicts of laws principles.

23. AXA Equitable waives its right to further notice and hearing in this matter as to any allegations of past violations up to and including the Effective Date of this Consent Order and agree that no provision of this Consent Order is subject to review in any court or tribunal.

24. This Consent Order may not be amended except by an instrument in writing signed on behalf of all parties to this Consent Order.

25. In the event that one or more provisions contained in this Consent Order shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Consent Order.

26. This Consent Order may be executed in one or more counterparts, and shall become effective when such counterparts have been signed by each of the parties hereto and approved by the Superintendent of Financial Services or his designee.

27. Upon execution by the parties to this Consent Order, DFS will discontinue the Investigation as and against AXA Equitable solely with respect to subject matter of the Investigation.

8

## VI.    Entire Agreement

28.    This Consent Order constitutes the entire agreement between DFS and AXA Equitable and supersedes any prior communication, understanding, or agreement, whether written or oral, concerning the subject matter of this Consent Order. No representation, inducement, promise, understanding, condition, or warranty not set forth in this Consent Order has been relied upon by any party to this Consent Order.

29.    The Effective Date of this Consent Order is the date on which it shall have been approved by the Superintendent of Financial Services.

WHEREFORE, the signatures evidencing assent to this Consent Order have been affixed hereto on the dates set forth below.

Dated: March 17, 2014

DEPARTMENT OF FINANCIAL SERVICES

By: _____
Joy Feigenbaum
Executive Deputy Superintendent
Financial Frauds & Consumer Protection

March 17, 2014

AXA Equitable Life Insurance Company

By: _____
Anthony F. Recine
Managing Director and Deputy General Counsel of
AXA Equitable

March 13, 2014

THE FOREGOING IS HEREBY APPROVED.
IT IS SO ORDERED.

Dated: New York, New York
       March 17, 2014

_____
BENJAMIN M. LAWSKY
Superintendent of Financial Service

10