# EXHIBIT 6

*(Complaint in* Zweiman v. AXA Equitable Life Ins. Co.,
*S.D.N.Y. Civ. A. No. 14-cv-3128 (VSB)(DCF);*
*filed May 2, 2014; voluntarily dismissed June 19, 2014)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



JESSICA ZWEIMAN, Executrix, on behalf of the
Estate of Anne Zweiman, and all others similarly
situated,

                              Plaintiff,

        v.

AXA EQUITABLE LIFE INSURANCE COMPANY,

                              Defendant.

14 CV 3128

## CLASS ACTION COMPLAINT

Jessica Zweiman, as Executrix on behalf of the Estate of Anne Zweiman (the "Estate"),[1]

and all others similarly situated, by her attorneys, complains, upon knowledge as to her own acts

and upon information and belief as to all other matters, as follows:

## SUMMARY OF CLAIM

1.      This action arises out of Defendant AXA Equitable Life Insurance Company's

("AXA Equitable" or the "Company") improper application of an investment strategy designed

to reduce its own risk and market exposure at the expense of its variable annuity policyholders.

In 2009, AXA Equitable, in violation of New York Insurance law, began aggressively applying

an investment strategy to new and existing variable annuity contracts that uses futures and

options to reduce equity exposure and manage volatility (referred to herein as "AXA Equitable's

Hedging Strategy" or the "Hedging Strategy").  The effect of the Hedging Strategy, as set forth

---

[1] Jessica Zweiman, as executrix for the Estate and, Anne Zweiman or her Estate, are collectively
referred to herein as "Plaintiff," unless otherwise noted.

in greater detail below, was to reduce the Company's potential liability at the expense of the annuitant policyholders, whose account values and guaranteed benefits under the terms of their variable annuity contracts were suppressed.

2.     In 2011, the New York State Department of Financial Services ("DFS" or the "Department") commenced an investigation pursuant to the New York Insurance Law concerning the Company's use of the Hedging Strategy in new and existing equity portfolios, including, but not limited to, the new AXA Tactical Manager Portfolios (the "ATM Portfolios"), which the Company debuted in May 2009.

3.     Pursuant to its March 17, 2014 "Consent Order"[2] with AXA Equitable, the DFS concluded that AXA Equitable failed to adequately inform the DFS and its predecessor, the New York State Insurance Department ("NYSID"), that it was implementing its Hedging Strategy in a manner that substantially changed its existing variable annuity products.

4.     Specifically, the Hedging Strategy is designed to smooth mutual funds' returns during periods of high market volatility using derivatives to reduce the funds' equity exposure. However, the application of the Hedging Strategy may, especially during highly volatile markets, limit the gains that may have otherwise accrued to a policyholder's account without the Hedging Strategy.  The DFS found that the Company violated New York. Insurance Law § 4240(e) by failing to inform and adequately explain the significance of the changes caused by the introduction and application of the Hedging Strategy to existing policyholders.  Nor did the Company explain how existing policyholders who had not elected to invest in the Hedging Strategy could nonetheless end up having that strategy applied to their investment options.

---

[2] References to the Consent Order are cited as "CO ¶ __".

5.      Many AXA Equitable policyholders purchased variable annuities that included guaranteed annual increases in living benefits (income) and death benefits, regardless of the performance of the underlying investments.  Having paid for a guaranteed return of, for example, six percent even in the event of a downturn in performance, these policyholders were interested in taking advantage of more aggressive investments to capture market rises to maximize their account values that served as the basis for determining their income and death benefits.

6.      However, the Hedging Strategy effectively suppressed the value of certain guaranteed benefits that are eligible for periodic benefit base resets because the benefit base is only available for resets when the policyholder's account value rises.

7.      The Hedging Strategy effectively changed the nature of the product that the policyholders purchased, yet AXA Equitable did not explain to the DFS that it was making material changes to its variable annuity products, which were unilaterally imposed upon existing policyholders to their financial detriment.  As a result, AXA Equitable violated New York Insurance Law and, in failing to comply with the statutory requirements necessary to implement the Hedging Strategy, breached the terms of its variable annuity contracts with its policyholders.

8.      Pursuant to the Consent Order, the Company was ordered to pay a civil fine in the amount of $20 million dollars to the DFS under Section 109 of the New York Insurance Law.

## PARTIES

9.      Jessica Zweiman is the executrix for the Estate of her mother, Anne Zweiman, a resident of the State of New York.  Anne Zweiman purchased a combination fixed and deferred variable annuity issued by AXA Equitable dated October 16, 2008 (the "2008 Policy").  The 2008 Policy is identified by AXA Equitable as certificate number 3-08658884, and its "Contract

Type" is identified as "Accumulator Elite, (Rollover IRA)." Plaintiffs' initial contribution under the 2008 Policy was $245,044.40.

10.     Defendant AXA Equitable, established in 1859, is a stock life insurance company organized under New York law with its principal place of business located at 1290 Avenue of the Americas, 13th Floor, New York, NY 10104.  Formed by a merger of Equitable Life Insurance Company with the French company AXA S.A. in the early 1990's, AXA Equitable is among the largest life insurance companies in the United States.  AXA Equitable registered with the DFS, and, according to publicly available documents, is licensed to sell life insurance and annuities in all fifty states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

11.     AXA Equitable offers a variety of insurance products and variable and fixed-interest annuity products principally to individuals, small and medium-size businesses and professional and trade associations.  According to AXA Equitable's Form 10-K for the year ended December 31, 2013, variable annuity products account for a substantial portion of sales, with nearly 75% of total premiums and deposits (approximately $9.6 billion) attributable to variable annuities.  AXA Equitable is the wholly-owned subsidiary of AXA Equitable Financial Services, LLC.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to the provisions of the Class Action Fairness Act of 2005 ("CAFA"), codified in 28 U.S.C. §§ 1332(d) and 1453, because: (1) the putative class consists of at least hundreds of proposed members; (2) the citizenship of at least one class member is different from AXA Equitable's; and (3) the aggregate amount placed in controversy by the claims of Plaintiff and the putative class members exceeds the sum of $5,000,000, exclusive of interest and costs.

13.     In addition, this action is a "class action," which contains class allegations and expressly seeks certification of a proposed class of individuals, within the meaning of CAFA. *See* 28 U.S.C. §§ 1332(d) and 1453(a).

14.     Venue is proper in this District because AXA Equitable is organized under New York law, has its principal place of business in this District, and many of the events and agreements described below either occurred in, or were entered into, this District.

## FACTS

### Background on Variable Annuity Products

15.     AXA Equitable touts itself as one of the country's leading issuers of variable annuity and variable life insurance products. A variable annuity is a contract between the purchaser or "annuitant" and an insurance company, under which the insurance company agrees to make periodic payments to the annuitant, beginning either immediately or at some future date. The annuitant can purchase the variable annuity contract by making either a single purchase payment or a series of purchase payments to the insurance company seller.

16.     The annuitant typically controls how the principal is invested, choosing from a set of portfolios according to the annuitant's investment strategy. During the "accumulation phase" of a deferred annuity—from the time the policy is purchased to the time it begins to pay out—the value of the annuity will rise or fall depending upon the performance of the underlying investment options selected by the annuitant. After a defined number of years, the policy will reach its maturity date and begin to pay benefits to the annuitant, known as the "payout phase." An annuitant is not guaranteed a specified level of return under this basic form of policy— instead, the payment amount will vary depending upon the value of the account upon maturity and the annuitant's life expectancy. Thus, the annuitant bears the investment risk of the selected

investments options. *See* U.S. Securities and Exchange Commission, *Variable Annuities: What You Should Know*, *available at* http://www.sec.gov/investor/pubs/varannty.htm (last visited April 30, 2014) (referred to herein as "SEC Variable Annuities").

17.     Although variable annuities are typically invested in mutual funds, they include certain insurance features that differentiate them from mutual funds and make them attractive to retirees as a way to convert their assets into a stream of future payments:

- First, variable annuities permit the annuitant to receive periodic payments for a period certain or as long as they live (or the life of a spouse or any other person so designated). This feature offers protection against the possibility that, after an individual retires, he or she will outlive his assets.

- Second, variable annuities offer a guaranteed death benefit. If the policyholder dies before the insurer has started making payments, the designated beneficiary is guaranteed to receive a specified amount—typically at least the amount of the policy holder's contributions. The beneficiary will get a benefit from this feature, if, at the time of the policyholder's death, the actual account value is less than the guaranteed amount.

- Third, variable annuities are tax-deferred. That means that an individual will not pay taxes on the income and investment gains until the funds are withdrawn from the account. He may also transfer money from one investment option to another within a variable annuity without paying tax at the time of the transfer. When money is taken out of a variable annuity, however, the individual will be taxed on the earnings at ordinary income tax rates rather than lower capital gains rates. The benefits of tax-deferred income generally outweigh the costs associated with a variable annuity when it is held as

a long-term investment to meet retirement and other long-range goals. *See* SEC
Variable Annuities.

**AXA Equitable's Variable Annuity Business and Products**

18.     Variable annuity products account for a substantial portion of AXA Equitable's
sales, representing over 70% (approximately $7.6 billion) of AXA Equitable's total premiums
and deposits in 2009, and nearly 75% (approximately $9.6 billion) of total premiums and
deposits by 2013 year-end.

19.     In order to market variable annuity products, AXA Equitable has established
numerous "separate accounts" under New York and Federal law, which are registered with the
Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 (the
"1940 Act"), 15 U.S.C. § 80 a-1 *et. seq.* Under the 1940 Act, assets are placed in the separate
accounts to support the variable annuity contracts and certificates that AXA Equitable offers.
Income and realized and unrealized gains and losses from the assets of the separate accounts are
required to be credited to or charged against the separate accounts without regard to AXA
Equitable's general assets, income, gains or losses.  15 U.S.C. § 80(a)-2(37).

20.     The "growth of Separate Account assets under management" has been, and
remains, "a strategic objective of the Company, which seeks to increase fee-based revenues
derived from managing funds for its clients."  In fact, during the five year period from 2005
through 2009 (preceding the changes adopted by AXA Equitable that are the subject of this
action), separate account assets for individual variable annuities and variable life insurance
policies increased by 33%, or $22.46 billion, to reach $84.02 billion.  These managed accounts
continued to increase in value to $104.5 billion at year-end 2013.[3]

---

[3] *See* AXA 2009 10-K at 1-2; AXA 2013 10-K at 1-4.

21.     AXA Equitable's separate accounts offer variable annuity purchasers "variable investment options," that correspond to shares of  mutual fund portfolios of the EQ Advisors Trust ("EQAT"), and the AXA Premier VIP Trust ("VIP") (together, the "Trusts").  The Company established the Trusts as open-ended diversified management investment companies to sell shares from their fund portfolios to AXA Equitable's separate accounts for the benefit of variable annuitants.

22.     The Trusts offer annuitants a choice of single or multi-advised equity, bond and money market investment portfolios, hybrid portfolios whose assets are allocated among multiple sub-advisers, and several "asset allocation" portfolios that invest in other portfolios of EQAT and/or VIP Trust and other unaffiliated investment companies or exchange traded funds.

23.     One group of allocation portfolios offered by the Trusts to the separate accounts is referred to as the "AXA Allocation Portfolios."  The AXA Allocation Portfolios are what is typically known as a "fund of funds," because each AXA Allocation Portfolio pursues its objectives by investing in other mutual funds selected and managed by AXA Equitable.

24.     AXA Equitable's flagship variable annuity contract, the Accumulator, was first introduced by the Company in 1995.  The Company has since introduced other variable annuities under the Accumulator brand name, including the Accumulator, Accumulator Advisor, Accumulator Plus, Accumulator Select, and Accumulator Elite (collectively referred to as the "Accumulator Series").

25.     The Accumulator Series and other variable annuities sold by AXA Equitable typically offer one or more enhanced guarantee features in addition to the standard return of principal death benefit guarantee.  In exchange for an additional fee, AXA Equitable offers a guaranteed minimum rate of growth, even in the event of a market downturn, for purposes of

determining death benefits and the amount of income that can be withdrawn in a given year. The guarantee features offered by AXA Equitable include: (i) a guaranteed minimum death benefit ("GMDB"); (ii) guaranteed minimum income benefits ("GMIB"); (iii) guaranteed minimum accumulation benefits; and (iv) guaranteed withdrawal benefits for life.

26.     The GMDB is equal to the annuitants' initial contribution on the contract date. Thereafter, the GMDB is reset yearly based on the greater of (i) its value the previous year, adjusted for any contributions or withdrawals, or (ii) the actual cash value of the account, reflecting the investment returns during the year (referred to as the "Annual Ratchet"). The GMIB is also adjusted for any contributions or withdrawals.

27.     The guaranteed features utilize a "Benefit Base," which is used to predict the minimum income withdrawal amount under the GMIB or determine the death benefit under the GMDB. The Benefit Base is distinct from the annuity's cash or account value. The Benefit Base is equal to the initial contribution amount, and increases at a specified rate, here, six percent, which is called the "6% Roll-up." The use of a predetermined annual roll-up assures that the Benefit Base will increase at a constant rate regardless of market performance of the account. On the other hand, if an annuitant's contributions plus market gains exceed the guaranteed roll-up amount, the GMIB Benefit Base will "reset" annually to the higher account value, *i.e.*, the Annual Ratchet.

28.     For example, if an annuitant's investment account and accumulated GMIB base were both equal to $10,000 at the beginning of the year, and the annuitant's investment account grew from $10,000 to only $10,250 during the course of the year, her GMIB base at the end of the year would be set to $10,600, since that amount (*i.e.*, $10,000 rolled up by 6%) was *greater* than the value of the investment account. Conversely, if the investment account grew from

$10,000 to $12,345, her GMIB base at the end of the year would be set to $12,345, the actual value of the investment account.

29.    The 2008 Policy included a GMIB Rider and a GMDB Rider – Annual Ratchet to Age 85.

30.    Plaintiff and other variable annuitants who have selected guaranteed minimum benefit features are contractually protected from losses resulting from poor market performance of their chosen investment options.  Having paid for the downside protection, these annuitants often focus on aggressive variable investment options designed to maximize their account value, which will, in turn, increase the amount of annual income and death benefits above guaranteed minimum rates.

**The Financial Crisis Prompted AXA Equitable To Improperly**
**Eliminate Guaranteed Benefits**

31.    In the wake of the 2008–2009 financial crisis life insurance companies began raising the costs and lowering the guarantees tied to variable annuities, especially those sold with guaranteed living benefit riders.  Insurers realized that variable annuity contracts written before the crash left them overexposed to liabilities.  While clients' actual account values fell and interest rates declined, insurance companies were nonetheless obligated under these contracts to provide guaranteed lifetime income at preset rates, which was precisely the reason the annuitants purchased these features in the first place.

32.    With many of the Company's variable annuity products (including the 2008 Policy) promising guaranteed returns of six percent or more, substantially higher than other available competing fixed-income investments in the marketplace, AXA Equitable realized that its profits from these products would not be as high as it had hoped, and that it would have to keep more funds in reserve to pay out death and income benefits than it desired.

33.     Accordingly, the Company took steps to reduce its exposure and protect its profit levels.  First, the Company began to reduce the level of guaranteed financial benefits to purchasers of new annuities.  Second, AXA Equitable eliminated existing customers' ability to make further contributions to their outstanding annuities.  Third, the Company made offers to buy out its customers' death benefits (including GMDBs) in its legacy annuities.

34.     With respect to its GMBD buy-out program, the Company offered financial credits at a discount to the current value of the GMDB, in exchange for the customer's agreement to cancel the GMDB.  As reported by the *Investment News* in its September 26, 2013 edition: "In general, clients can expect to be offered about 70% of the actuarial valuation of the reserves for the GMIB and GMDB, or two times the annual fees for the GMIB, GMDB and the EEB, based upon the current benefit base – whichever is greater."[4]  The *Investment News* observed that "[a]dvisors traditionally have pushed back against these offers, encouraging clients to stay in their contracts, particularly if there is a significant difference between the size of the benefit base and the actual account value.  It would be hard to find similar guaranteed features on today's annuities."  As explained in the article by Mitchell Kauffman, managing director of Kauffman Wealth Services, "the [current] structure is so much better than anything we can replace it with that I am hard-pressed to recommend that people take it."

35.     When customers declined to voluntarily relinquish their guaranteed returns, the Company decided in some instances to improperly strip away customers' death benefits.  For example, the Company began informing customers over 75 years of age of unilateral "corrections" that were going to be made to their GMDBs.  These so-called corrections retroactively eliminated up to 10 years of growth in the customer's Benefit Base that had

---

[4] Darla Mercado, *Second wave of VA buyout offers come from Axa*, Investment News, Sept. 26, 2013, http://www.investmentnews.com/article/20130926/FREE/130929923.

accrued under the GMBD roll-up provisions in cases where a successor owner annuitant had

reached 75 years of age by the time of the predecessor owner annuitant's death. *See, e.g.,*

*Grissom v. AXA Equitable Life Ins. Co.*, No. 1:14-cv-00768 (JPO) (S.D.N.Y.).

**The DFS Investigation and Consent Order**

36.     Another way that AXA Equitable decided to reduce its market exposure was to

aggressively implement the Hedging Strategy in a large number of new and existing variable

investment options offered by the Accumulator Series and other variable annuity contracts.

37.     In 2011, the DFS commenced a three-year investigation of AXA Equitable

pursuant to the New York Insurance Law, concerning the Company's unilateral and improper

imposition of the Hedging Strategy to new and existing variable annuity contracts.[5] The DFS

investigation resulted in the issuance of the Consent Order as described above.

38.     As reported in the Consent Order, from 2009 through 2011, AXA Equitable filed

with the NYSID and DFS requests pursuant to New York Insurance Law § 4240(e) to amend

and restate the Plans of Operation for the Company's separate accounts, including Nos. A, 45,

49 and 70, the accounts that contain AXA Equitable's variable annuity accounts.

39.     These filings introduced the Hedging Strategy through new and existing funds.

However, in violation of New York Insurance Law § 4240(e), AXA Equitable failed to inform

and adequately explain to the DFS the significance of the changes caused by introduction and

application of the Hedging Strategy to existing policyholders.  As a result, the Company failed

to comply with the requirements necessary to obtain proper approval to market new mutual

---

[5] Presumably because the Hedging Strategy is the primary strategy employed by the new ATM
Portfolios that the Company debuted in 2009, the Consent Order refers to the Hedging Strategy
as the "ATM Strategy." However, the Consent Order itself observed that the strategy was
introduced through new funds and existing funds not just the ATM Portfolio. CO ¶ 3.

funds or change existing investment options that introduced the Hedging Strategy.

40.     The Company's filings led the DFS and NYSID to believe that the changes were

"merely routine additions of funds and similar alterations" and "[t]he Department approved the

filings on that basis."  CO ¶ 9.  In actuality, the Hedging Strategy substantially changed the

nature of the variable investment options in the Company's separate accounts.  The DFS

concluded that "[t]he absence of detail and discussion in the filings regarding the significance of

the implementation of the [Hedging] Strategy had the effect of misleading the Department

regarding the scope and potential effects of the [Hedging] Strategy on the relevant funds and the

possible consequences for policyholders."  *Id.* ¶ 8.  "Had the Department been aware of the

extent of the changes, it may have required that the existing policyholders affirmatively opt in to

the [Hedging] Strategy."  *Id.* ¶ 9.

41.     As described above, the Hedging Strategy uses derivatives to reduce funds' equity

exposure in the variable annuity investment options offered by AXA Equitable to its customers.

The Consent Order found that the application of the Hedging Strategy, especially during highly

volatile markets, limits the gains that may have otherwise accrued to a policyholder's account in

the absence of the Hedging Strategy.  CO ¶ 5.

42.     Many customers invested in variable annuities, including variable annuities with

guaranteed living and death benefits.  These policyholders were comfortable taking aggressive

positions to capture market rises because they had purchased a guaranteed six percent rate of

return regardless of the performance of their selected investment options.  Because such

policyholders were protected in a declining or flat market, they invested aggressively in hopes

of maximizing their account values and the corresponding annual Benefit Base for determining

income and death benefit levels.  CO ¶ 6.

43.     The DFS concluded that the Hedging Strategy effectively suppressed the value of certain guaranteed benefits that are eligible for periodic benefit base resets because, for example, the benefit base is only available for resets when the policyholder's account value rises. CO ¶ 7.

44.     Further, AXA Equitable failed to address how existing policyholders who had not elected to invest in the Hedging Strategy could nonetheless end up being invested in such funds. CO ¶ 3.

45.     For example, the 2008 Policy, as of year-end 2009, was invested in one of the AXA Allocation Portfolios known as the "AXA Conservative-Plus Allocation Portfolio." The AXA Allocation Portfolios,[6] including the AXA Conservative-Plus Portfolio, pursue their investment objectives by investing exclusively in other mutual funds managed by AXA Equitable (these mutual funds are known as the "Underlying Portfolios").

46.     By 2010, the Company modified several Underlying Portfolios of the AXA Allocation Portfolios to employ the Hedging Strategy that is the subject of the Consent Order. These Underlying Portfolios include, but are not limited to, the following:

- Multimanager Aggressive Equity Portfolio;

- Multimanager Large Cap Core Equity Portfolio;

- Multimanager Large Cap Growth Portfolio;

- Multimanager Large Cap Value Portfolio;

- Multimanager International Equity Portfolio;

- EQ/Large Cap Value PLUS Portfolio;

---

[6] The additional AXA Allocation Portfolios include: AXA Aggressive Allocation Portfolio; AXA Conservative Allocation Portfolio; AXA Moderate Allocation Portfolio; and the AXA Moderate-Plus Allocation Portfolio.

- EQ/Large Cap Core PLUS Portfolio;

- EQ/Large Cap Growth PLUS Portfolio, and

- EQ/International Core PLUS Portfolio.

47.    In 2010, AXA Equitable also amended the list of the Underlying Portfolios comprising the AXA Allocation Portfolios to add the AXA Tactical Manager 400, 500, 2000 and International Portfolios, all of which applied the Hedging Strategy that is the subject of the Consent Order.

48.    Accordingly, the Hedging Strategy was introduced to several of the Underlying Portfolios of the AXA Allocation Portfolio in which Plaintiff was invested.

49.    By 2010, AXA Equitable also implemented the Hedging Strategy that is the subject of the Consent Order directly or indirectly in a large number of other variable investment options including, but not limited to, the following:

      a.   <u>EQ Advisors Trust Portfolios</u>: EQ/AXA Franklin Small Cap Value Core Portfolio; EQ/Equity Growth PLUS Portfolio; EQ/ Franklin Core Balanced Portfolio; EQ/Global Multi-Sector Equity Portfolio; EQ/International Core PLUS Portfolio; EQ/Large Cap Core PLUS Portfolio; EQ/Large Cap Growth PLUS Portfolio; EQ/Large Cap Value PLUS Portfolio; EQ/Mid Cap Value PLUS Portfolio; EQ/Mutual Large Cap Equity Portfolio; and the EQ/Templeton Global Equity Portfolio;

      b.   <u>Strategic Allocation Portfolios</u>: AXA Growth Strategy Portfolio; AXA Moderate Growth Strategy Portfolio; AXA Balanced Strategy Portfolio; AXA Conservative Growth Strategy Portfolio; and the AXA Conservative Strategy Portfolio.

    c.   AXA Tactical Manager Portfolios: AXA Tactical Manger 2000 Portfolio, AXA Tactical Manager 500 Portfolio; AXA Tactical Manager 400 Portfolio; and the AXA Tactical Manger International Portfolio;

    d.   AXA Franklin Allocation Portfolios; EQ/Franklin Templeton Allocation Portfolio and the EQ/Franklin Core Balanced Portfolio; and the

    e.   AXA Premier VIP Trust Portfolios: Multimanager Aggressive Equity Portfolio; Multimanager International Equity Portfolio, Multimanager Large Cap Core Equity Portfolio; Multimanager Large Cap Value Portfolio, Multimanager Mid Cap Growth Portfolio; Multimanager Mid Cap Value Portfolio; Multimanager Small Cap Growth Portfolio; and the Multimanager Small Cap Value Portfolio.[7]

50.    In the 2008 Policy (§ 2.01 B), the Company represented that the Separate Account under which Plaintiff's variable annuity was offered was maintained "in accordance with the laws of New York State" and that "[w]e may, at our discretion, invest Separate Account assets in any investment permitted by law."

51.    Section 2.04 further provided that "we have the right, subject to compliance with applicable law, including approval of certificate owners if required: (a) to add Investment Funds…or to remove Investment Funds from, the Separate Account, or add other separate accounts."

---

[7] On or about January 31, 2014, AXA Premier Trust filed supplements to its Prospectuses dated May 1, 2013 pertaining to the Multimanager Portfolios. According to the filings, as of January 31, 2014, each of the Multimanager Portfolios was able to "utilize futures and options…to manage equity exposure when market volatility increased above specific thresholds set for the Portfolio. Pursuant to this strategy, the Manger [AXA Equitable] may limit equity exposure either by reducing investments in securities, shorting or selling long futures and options positions on an index, increasing cash levels, and/or shorting an index." However, "[e]ffective on or before April 30, 2013, each Multimanager Portfolio will no longer utilize this investment strategy…." (emphasis added).

52.     "[I]f the exercise of these rights result[ed] in a material change in the underlying

investment of a separate account," AXA Equitable was also obligated under § 2.04 to notify

policyholders, "as required by law."

53.     The Accumulator Series and other variable annuity products sold by AXA

Equitable contained substantially identical contract provisions relating to the Company's

obligations to comply with the applicable law with respect to the introduction or modification of

investment options and strategies that materially impacted the nature value of variable

investment options.

54.     As a result of the unilateral changes to its annuity products implemented by AXA

Equitable during 2009 through 2011, holders of Accumulator Series contracts and other AXA

Equitable variable annuity products were unlawfully exposed to the Hedging Strategy in

violation of the New York Insurance Law and the terms of their contracts.  As a result,

Defendant AXA Equitable (a) deprived the policyholders of AXA Equitable variable annuities

of the increases in the value of their variable annuities; and (b) reduced the value of guaranteed

benefits eligible for periodic benefit base resets.

## CLASS ACTION ALLEGATIONS

55.     This action is brought as a class action on behalf of all persons who purchased

variable annuities from AXA Equitable which subsequently became subject to the Hedging

Strategy, and who suffered injury as a result thereof (the "Class").

56.     This action is properly brought as a class action under Fed. R. Civ. P. 23(a) and

(b)(3) for the following reasons:

      a.  Numerosity: The Class consists of hundreds if not thousands of persons and is so

          numerous that joinder of all members, whether otherwise required or permitted, is

impracticable.  AXA Equitable reported over $80 billion of outstanding annuity

contracts as of the beginning of the class period in 2009.

    b.  Commonality: There are questions of law or fact common to the Class which

predominate over any questions affecting only individual Class members,

including:

        i.  whether the implementation of the Hedging Strategy constituted a material
change in the investment options selected by existing policy holders;

       ii.  whether AXA Equitable violated New York Insurance Law in amending
the separate accounts to introduce the Hedging Strategy;

     iii.  whether AXA Equitable breached its variable annuity contracts by
implementing the Hedging Strategy; and

     iv.  whether AXA Equitable breached its implied obligation of good faith and
fair dealing to Plaintiff and other variable annuity owners;

      v.  whether AXA Equitable violated its statutory duty of care with respect to
the allocation of mutual funds invested in the separate accounts;

     vi.  whether the Class was injured and the basis upon which damages should
be calculated to compensate for the injury.

    c.  Typicality: The claims asserted by Plaintiff and the defenses relating thereto are

typical of the Class; and

    d.  Adequacy: Plaintiff will fairly and adequately protect the interests of the Class

and has retained attorneys experienced in class and complex litigation.  Plaintiff

has no interest antagonistic to or in conflict with those of the Class.

    57.    Class action status is further warranted under Rule 23(b)(3) because a class action

is superior to the other available methods for the fair and efficient adjudication of this

controversy.

## COUNT 1
## (BREACH OF CONTRACT)

58.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

59.     At all relevant times, Plaintiff and the other Class members maintained variable annuity contracts with AXA Equitable.

60.     AXA Equitable was required under the terms of variable annuity contracts with Plaintiff and other class members, *inter alia*, to (a) maintain its separate accounts in accordance with the laws of New York State; (b) add or remove investment funds in compliance with applicable law, including obtaining approval of certificate owners if required; and (c) notify the certificate owners if the exercise of the Company's right to add, change or remove investment options resulted in a material change in the underlying investment in a separate account.

61.     It is also a cardinal rule of Insurance Law that a policy cannot be issued in violation of law, and that the statutory provisions are implied terms of all insurance contracts.

62.     The DFS found that AXA Equitable violated New York Insurance § 4204(e) in adding the Hedging Strategy to new and existing mutual fund investment options and that the Department's approval of such strategy had been improperly obtained.

63.     As described above, AXA Equitable breached the express and implied terms of its variable annuity contracts with Plaintiff and the Class.

64.     Plaintiff and the other Class members have performed all of their obligations under the variable annuity contracts.

65.     AXA Equitable is liable for the damages sustained by Plaintiff and all other injured variable annuity policyholders by virtue of application of the Hedging Strategy in an amount to be determined at trial.

## COUNT II
### (BREACH OF CONTRACT AND THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING)

66.     Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

67.     Inherent in their variable annuity contracts was, and is, an implied covenant of good faith and fair dealing, requiring AXA Equitable to deal fairly with Plaintiff and the other members of the Class, to fulfill their obligations to Plaintiffs in good faith, and not to take action that frustrates the purpose of the contract or deprives Plaintiff and the Class of the fruits of their bargain.

68.     AXA Equitable breached this duty and, without reasonable basis and with improper motive, acted in bad faith by:

    a.   introducing the Hedging Strategy in violation of New York Insurance Law § 4204(e), *i.e.,* by failing to disclose to the NYSID and DFS that the Hedging Strategy materially changed the nature of the Company's investment options and advise the Department of the suppressive effect of the Hedging Strategy on the value of is annuitants' accounts and guaranteed benefits;

    b.   adopting the Hedging Strategy for the purpose of reducing its own equity exposure at the expense of Plaintiff and other variable annuitants whose account values were suppressed and guaranteed benefits reduced;

    c.   failing to advise the NYSID and DFS that existing policyholders who did not chose to invest in funds that applied the Hedging Strategy (like Plaintiff, for example, who invested in an AXA Allocation Portfolio), nonetheless could end up invested in such funds because AXA Equitable would: (i) modify the strategies

of certain Underlying Portfolios to employ the Hedging Strategy; and (ii) add new

portfolios that applied the Hedging Strategy; and

d.   failing to notify policyholders of the material change in the nature of their

investment and to obtain their approval to remain in funds that applied the

Hedging Strategy.

69.    AXA Equitable deprived Plaintiff and other variable annuitants with the annual

6% Roll-up of the fruits of their bargain.  Having paid for the pre-set increase even in the event

of a market downturn, these policyholders were interested in pursuing investment options that

would maximize their account values, which served as a basis of determining their income and

death benefits.  In unlawfully adopting the Hedging Strategy in order to reduce its own exposure,

Defendant acted to the detriment of annuitants with a guaranteed 6% roll-up by suppressing their

account value and limiting the gains that may accrue to a policyholder's account without the

Hedging Strategy.

70.    Plaintiff and the other members the Class suffered damages as a direct and

proximate result of the forgoing breach of the implied covenant of good faith and fair dealing.

## COUNT III
## (NEGLIGENCE)

71.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

72.    AXA Equitable owed to Plaintiff and the Class a statutory duty with respect to the

investment of funds allocated to its Separate Accounts.  Specifically, Defendant was required to

invest and reinvest for such Separate Accounts in good faith and with that degree of care that an

ordinarily prudent person in the like position would use under similar circumstances.  N.Y. Ins.

L. § 4240(a)(2).

73.     AXA Equitable breached its duty of prudence because as described above, Defendants' adoption of the Hedging Strategy was not in good faith but rather, implemented in violation of New York Insurance Law at the expense of Plaintiff and other variable annuitants whose amount values were suppressed.

74.     Plaintiff and the members of the Class suffered damages as a direct and proximate result of Defendant's conduct in an amount to be determined at trial.

## JURY DEMAND

75.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff demands judgment against AXA Equitable as follows:

A.    Determining that this action may proceed as a class action maintainable under Fed. R. Civ. P. 23 on behalf of the Class, as defined above;

B.    Awarding Plaintiff and the Class damages to the extent such damages may be awarded under the cause of action alleged;

C.    Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' fees, expert witness fees, and other costs; and

D.    Granting such other and further relief as may be just and proper.

Dated: White Plains, New York
       May 1, 2014

LOWEY DANNENBERG COHEN &
HART, P.C.

By:_____
Barbara J. Hart (BH-3231)
David Harrison (DH-3834)
One North Broadway, Suite 509
White Plains, NY 10601-2301
Telephone: (914) 997-0500