UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JESSICA ZWEIMAN, Executrix of the Estate
of Anne Zweiman, on behalf of herself and all :
others similarly situated,

                                :

                    Plaintiff,          No. 14-cv-5012 (VSB)(DCF)

                                :

          v.                   **ECF CASE**

                                :

AXA EQUITABLE LIFE INSURANCE     **Electronically Filed**
COMPANY,                        :

                  Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW OF AXA EQUITABLE LIFE INSURANCE COMPANY
(A) IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT AS
PRECLUDED BY THE SECURITIES LITIGATION UNIFORM STANDARDS ACT
AND (B) IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

Jay B. Kasner
Kurt Wm. Hemr
Tansy Woan
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Dated:  September 5, 2014       *Attorneys for Defendant AXA Equitable
                                  Life Insurance Company*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

ALLEGATIONS AND FACTS WHICH THE COURT MAY CONSIDER .................................. 3

    1.    Anne Zweiman Purchases An AXA Equitable Variable Annuity Contract
        *(October 2008)* ..................................................................................... 3

    2.    Volatility Management Is Introduced Into Certain Investment Funds
        Offered To Anne Zweiman And Other AXA Equitable Variable Annuity
        Contract Holders *(May-September 2009)* ................................................ 6

    3.    Anne Zweiman Reallocates All Of Her Account Value To Investment
        Funds Without Volatility Management *(February 2010)* ............................ 7

    4.    Anne Zweiman Reallocates A Portion Of Her Account Value To Two
        Investment Funds Which Use Volatility Management *(June 2013)* ............... 7

    5.    Anne Zweiman Dies And Her Executor Commences This Action;
        AXA Equitable Agrees To Specified Relief In A Consent Order Entered
        By A New York State Regulator *(March-May 2014)* ................................ 7

PRIOR PROCEDURAL HISTORY ............................................................................. 9

APPLICABLE LEGAL STANDARDS .......................................................................... 10

    1.    SLUSA Precludes Maintenance Of Class Actions Based On Certain State
        Law Claims Relating To Covered Securities And Requires Dismissal Of
        Those Actions ..................................................................................... 10

    2.    For Purposes Of SLUSA Claim Preclusion Analysis, Both Variable
        Annuities And "Accumulation Units" Of The Separate Account Constitute
        "Covered Securities" ............................................................................ 11

    3.    To Determine Whether A Claim Is Precluded Under SLUSA, Courts Must
        Apply The "Artful Pleading" Doctrine And "Look Beyond The Face Of
        The Complaint" ................................................................................... 12

ARGUMENT ................................................................................................................15

I.      PLAINTIFF ALLEGES AN OMISSION OF MATERIAL FACT — *I.E.*, A
        PURPORTED FAILURE TO NOTIFY CONTRACT HOLDERS OF A
        "MATERIAL CHANGE" IN THEIR INVESTMENT — AND HER CLAIM IS
        THEREFORE PRECLUDED BY SLUSA ......................................................................15

        A.      On Its Face, Plaintiff's Complaint Alleges That AXA Equitable Breached A
                Provision Of Anne Zweiman's Annuity Contract Requiring Notification To
                Policyholders Of A "Material Change" In An Underlying Investment, And
                Thus It Alleges An "Omission Of A Material Fact" Under SLUSA ......................15

        B.      Looking Beyond Plaintiff's Complaint, As The "Artful Pleading" Rule
                Provides, Confirms That Plaintiff Seeks To Pursue An Omission Claim
                Based On A Purported Failure To Notify Contract Holders ..................................17

II.     PLAINTIFF'S CLAIM IS ALSO BASED ON ALLEGED
        MISREPRESENTATIONS TO NEW YORK'S DEPARTMENT OF FINANCIAL
        SERVICES AND IS PRECLUDED BY SLUSA FOR THAT REASON AS WELL........20

III.    PLAINTIFF'S CLAIM IS ALSO PRECLUDED BY SLUSA FOR THE REASON
        THAT IT ALLEGES THAT AXA EQUITABLE USED A "MANIPULATIVE OR
        DECEPTIVE DEVICE OR CONTRIVANCE"..................................................................24

CONCLUSION............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>**                                                                                     **<u>Page(s)</u>**

<u>Beary v. ING Life Ins. & Annuity Co.</u>,
        520 F. Supp. 2d 356 (D. Conn. 2007) ........................................................................18, 19

<u>Chadbourne & Parke LLP v. Troice</u>,
        134 S. Ct. 1058 (2014) ............................................................................................22

<u>Dudek v. Prudential Sec., Inc.</u>,
        295 F.3d 875 (8th Cir. 2002) ..............................................................14, 17, 18, 24, 25

<u>Felton v. Morgan Stanley Dean Witter & Co.</u>,
        429 F. Supp. 2d 684 (S.D.N.Y. 2006) ..........................................................................24

<u>Freeman Invs., L.P. v. Pacific Life Ins. Co.</u>,
        704 F.3d 1110 (9th Cir. 2013) ......................................................................................19

<u>Gerin v. Aegon USA, Inc.</u>,
        242 F. App'x 631 (11th Cir. 2007)..................................................................................4

<u>In Re LIBOR-Based Fin. Inst. Antitrust Litig.</u>,
        935 F. Supp. 2d 666 (S.D.N.Y. 2013) ..........................................................................23

<u>In Re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.</u>,
        218 F.R.D. 76 (S.D.N.Y. 2003) ......................................................................................7

<u>In Re Merrill Lynch Auction Rate Sec. Litig.</u>,
        704 F. Supp. 2d 378 (S.D.N.Y. 2010), <u>aff'd</u>, 671 F.3d 120 (2d Cir. 2011)..........................4

<u>In Re Mut. Funds Inv. Litig.</u>,
        437 F. Supp. 2d 439 (D. Md. 2006), <u>aff'd</u>,
        309 F. App'x 722 (4th Cir.), <u>cert. denied</u> <u>sub nom.</u>
        <u>Wiggenhorn v. AXA Equitable Life Ins. Co.</u>, 558 U.S. 817 (2009) ..................................11

<u>Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.</u>,
        62 F.3d 69 (2d Cir. 1995) ..............................................................................................4

<u>Kircher v. Putnam Funds Trust</u>,
        547 U.S. 633 (2006)......................................................................................................11

<u>Lama Holding Co. v. Smith Barney Inc.</u>,
        88 N.Y.2d 413, 668 N.E.2d 1370 (1996) ......................................................................25

<u>Lander v. Hartford Life & Annuity Ins. Co.</u>,
        251 F.3d 101 (2d Cir. 2001) ................................................................................3, 4, 11

**CASES (cont'd)**                                                    **Page(s)**

McMahan & Co. v. Wherehouse Entertm't, Inc.,
     65 F.3d 1044 (2d Cir. 1995) ............................................................................25

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,
     547 U.S. 71 (2006)...........................................................1, 2, 10, 16, 21, 22, 23

Montoya v. N.Y. State United Teachers,
     754 F. Supp. 2d 466 (E.D.N.Y. 2010) ...........................................13, 14, 15, 24

Rabin v. JPMorgan Chase Bank, N.A.,
     No. 06-C-5452, 2007 WL 2295795 (N.D. Ill. Aug. 3, 2007).....................22, 23

Romano v. Kazacos,
     609 F.3d 512 (2d Cir. 2010) ...........................................2, 4, 12, 13, 14, 17, 18

Segal v. Fifth Third Bank, N.A.,
     581 F.3d 305 (6th Cir. 2009) ....................................................................14, 18

Stephens v. Gentilello,
     853 F. Supp. 2d 462 (D.N.J. 2012) ...................................................................23

Tolin v. Standard & Poor's Fin. Servs., LLC,
     950 F. Supp. 2d 714 (S.D.N.Y. 2013) ...............................................................13

Webster v. New York Life Ins. & Annuity Corp.,
     386 F. Supp. 2d 438 (S.D.N.Y. 2005) ...............................................................19

Winne v. Equitable Life Assurance Soc'y of U.S.,
     315 F. Supp. 2d 404 (S.D.N.Y. 2003)  ..............................................................24

**STATUTES**                                                          **Page(s)**

15 U.S.C. § 77r(b)(2) .............................................................................................11

Securities Litigation Uniform Standards Act,
     15 U.S.C. § 78bb(f).............................................................................. passim

Class Action Fairness Act,
     28 U.S.C. §§ 1332(d) and 1453 ..............................................................1, 9, 10

New York Insurance Law § 4240(e) ............................................................................7

**<u>RULES</u>**                                                                                          **<u>Page(s)</u>**

Fed. R. Civ. P. 10(c) ..............................................................................................7

Fed. R. Civ. P. 12(b)(6) ..........................................................................................4

Fed. R. Civ. P. 12(f) ...............................................................................................7

**<u>OTHER AUTHORITIES</u>**                                                                     **<u>Page(s)</u>**

S. Rep. No. 105-182 (1998) ...................................................................................10

Death Notice, <u>Anne Zweiman</u>, N.Y. Times, Mar. 17, 2014, at A19................................7

## PRELIMINARY STATEMENT

Plaintiff first asserted this claim against Defendant AXA Equitable Life Insurance Company ("AXA Equitable") as one of four plaintiffs who commenced separate actions in this Court, each on behalf of a proposed class of AXA Equitable variable annuity contract holders. Those four complaints alleged, in various ways, that AXA Equitable had omitted to make required disclosures to variable annuity contract holders and misled New York's Department of Financial Services ("DFS") regarding a new "volatility management" investment strategy made available to those annuity contract holders. Each of the four complaints asserted, among other things, a claim for breach of the annuity contract based on those alleged omissions and misrepresentations. Each of those plaintiffs asserted the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453, as the basis for federal subject matter jurisdiction.

In a letter submitted to the Court describing its anticipated motion to dismiss the first-filed of these four actions, AXA Equitable pointed out that variable annuities are "covered securities" under federal law and that the actions thus fell within the "covered security" exception to CAFA's grant of subject matter jurisdiction. (14-cv-2209 (D.E. 16).) AXA Equitable also noted the potential application of the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), codified at 15 U.S.C. § 78bb(f), which promotes the uniform application of federal disclosure standards for securities by prohibiting the maintenance of certain state law claims involving "covered securities" as class actions. Id.; see Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 82-84 (2006) ("Dabit").

Instead of attempting to defend a federal jurisdictional predicate, all four plaintiffs voluntarily dismissed their actions. Their counsel all united behind one Plaintiff, Jessica Zweiman (who appears as executor of her mother's estate), and filed a putative class action Complaint in New York state court which purports to allege a "simple breach of contract action."

1

(D.E. 15, at 2; see also, e.g., D.E. 17, at 1, 2.)  Now that Plaintiff had been alerted to the potential application of SLUSA to her claim, however, Plaintiff selectively edited her Complaint in an effort to avoid SLUSA claim preclusion.  Yet, notwithstanding those efforts, her claim is precluded.  AXA Equitable thus removed Plaintiff's state court action to this Court pursuant to SLUSA and now seeks dismissal of the action pursuant to that statute for the following three reasons, each of which forms an independent basis for preclusion:

**First,** Plaintiff's Complaint alleges on its face that AXA Equitable violated a provision of the annuity contract that requires that contract holders be notified in the event of a "material change" in the underlying investment.  She therefore alleges an "omission of a material fact in connection with the purchase or sale of a covered security," rendering her claim precluded by SLUSA.  15 U.S.C. § 78bb(f)(1)(A).  (See Part I.A infra.)  In addition, the Second Circuit has directed that courts must look "beyond the face of the complaint" to consider whether a claim has been "artfully pled" in an attempt to conceal that it is precluded by SLUSA.[1]  Here, consideration of documents beyond the Complaint confirms that Plaintiff alleges a failure to notify — i.e., an "omission of a material fact."  (See Part I.B infra.)  SLUSA precludes that claim.

**Second,** Plaintiff has acknowledged in this Court that her purported damages are the consequence of misrepresentations that AXA Equitable allegedly made to DFS, and indeed she has attached to her Complaint a document reciting DFS's findings that certain filings made with that regulator were "misleading."  (Compl. Ex. A, ¶ 8.)[2]  She thus alleges a "misrepresentation … of a material fact in connection with the purchase or sale of a covered security," 15 U.S.C. § 78bb(f)(1)(A), rendering her claim precluded by SLUSA.  Plaintiff argues that those purported

---

[1]   Romano v. Kazacos, 609 F.3d 512, 518-19 (2d Cir. 2010).

[2]   A copy of Plaintiff's Complaint (D.E. 1, Ex. 1) is attached as Exhibit 1 to the Declaration of Kurt Wm. Hemr ("Hemr Decl.") filed herewith.

misrepresentations to DFS were not made "in connection with" her mother's purchase of a variable annuity because they occurred after her mother purchased that contract.  But she ignores that her mother's annuity account value was invested in "covered securities," including in investment trusts that implemented the volatility management strategy of which Plaintiff complains.  AXA Equitable's purported misrepresentations to DFS (i.e., its filings addressing that strategy) were therefore made "in connection with" her mother's ongoing investment decisions to allocate her account value among investments within those trusts within the meaning of SLUSA.  Plaintiff also cannot avoid SLUSA preclusion on the theory that her claim is based on misrepresentations allegedly made to DFS, rather than on misrepresentations made to her mother directly:  Supreme Court precedent requires that SLUSA's "in connection with" language be read more expansively.  (See Part II infra (citing Dabit, 547 U.S. at 85, and other authorities).)

**Third,** Plaintiff alleges self-interested and deceptive conduct on the part of AXA Equitable that constitutes a "manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1)(B).  Her claim is therefore precluded under that prong of SLUSA as well.  (See Part III infra.)

As Plaintiff's counsel conceded at the August 6 conference, "if the Court finds SLUSA preclusion we're out of court."  (D.E. 25 (Hemr Decl. Ex. 2), at 5:23-24.)  Accordingly, Plaintiff's Complaint should be dismissed in its entirety as precluded by SLUSA and her Motion To Remand should be denied.

## ALLEGATIONS AND FACTS WHICH THE COURT MAY CONSIDER

### 1.    Anne Zweiman Purchases An AXA Equitable Variable Annuity Contract *(October 2008)*

Variable annuity contracts are "'hybrid products,' possessing characteristics of both insurance products and investment securities."  Lander v. Hartford Life & Annuity Ins. Co., 251

F.3d 101, 105 (2d Cir. 2001).  Investors in variable annuities may allocate their account value among investments similar to mutual funds, and thereafter may reallocate their account value from time to time.

On October 16, 2008, Anne Zweiman purchased a variable annuity contract from AXA Equitable with an initial contribution of $245,044.40.[3]  One investment option available under her contract was a "guaranteed interest option," which paid interest at a rate announced from time to time by AXA Equitable.[4]  Alternatively, Anne Zweiman could choose to have her account value invested in investment trusts via a "separate account" maintained by AXA Equitable.[5]

Separate accounts maintained by insurance companies are, like mutual funds, registered as investment companies with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940.  Lander, 251 F.3d at 105.  Anne Zweiman's contract provided that the AXA Equitable separate account "may be subdivided into Investment Funds"; that AXA Equitable had the right to add, remove, or combine those Investment Funds; and that AXA Equitable could, "at [its] discretion, invest Separate Account assets in any investment permitted by applicable law."[6]  The contract further provides that "if the exercise of these rights results in a

---

[3]    Hemr Decl. Ex. 3 (Anne Zweiman annuity contract, pt. 1), Data pages 1, 2.

As explained at pp. 12-15 infra, a court considering SLUSA claim preclusion is determining a jurisdictional question and, accordingly, may look to facts beyond the "four corners" of the complaint in making that determination.  That said, the facts set forth in this section are either allegations of the Complaint accepted as true for purposes of this motion only or facts which the Court could properly consider in addressing the legal sufficiency of pleading under Fed. R. Civ. P. 12(b)(6).  Specifically, the Court may consider Anne Zweiman's variable annuity contract referenced in the Complaint; public record prospectuses; and confirmations and account statements relating to her annuity.  Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (on motion to dismiss, court may consider contract that "is 'integral' to the complaint"); In Re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378, 386 n.5 (S.D.N.Y. 2010), aff'd, 671 F.3d 120 (2d Cir. 2011) (considering prospectuses on motion to dismiss); Gerin v. Aegon USA, Inc., 242 F. App'x 631, 632-33 (11th Cir. 2007) (similarly; variable annuity prospectus); Romano, 609 F.3d at 521 (account statements).

[4]    Hemr Decl. Ex. 3, Contract page 6, § 2.01(A).

[5]    Id. Contract page 6, § 2.01(B).

[6]    Id. Contract page 6, § 2.01(B); id. Contract page 8, § 2.04(a)-(c), (h).

material change in the underlying investment of a Separate Account, [the annuity holder] will be notified of such exercise, as required by law."[7]  Anne Zweiman's allocation of account value among Investment Funds was measured in "Accumulation Units" of the separate account.[8]

AXA Equitable used separate account funds to purchase shares of two investment trusts, AXA Premier VIP Trust and EQ Advisors Trust.[9]  Amounts that contract holders allocated to Investment Funds within the separate account were used to purchase corresponding shares of those Trusts that pursued particular investment strategies — e.g., stocks, bonds, or money market investments.

Anne Zweiman's contract listed dozens of Investment Funds available to her.[10]  Some of those funds are "sub-advised" by well-known investment managers other than AXA Equitable — e.g., BlackRock, JPMorgan, UBS and PIMCO — thereby further diversifying the investment opportunities available to her and to other AXA Equitable variable annuity contract holders.[11]

When Anne Zweiman purchased her variable annuity contract in October 2008, she allocated her contribution via a dollar-cost-averaging program.  Her contribution was initially allocated to a guaranteed interest option and was reallocated in twelve monthly increments into an Investment Fund called the "AXA Conservative-Plus Allocation Portfolio."[12]  That Portfolio

---

[7]   Id. Contract page 9, § 2.04 (emphasis added).

[8]   Id. Contract page 7, § 2.02.

[9]   "You may allocate amounts to any of the variable investment options.  Each variable investment option is a subaccount of Separate Account No. 49.  Each variable investment option, in turn, invests in a corresponding securities portfolio ('Portfolio') of the AXA Premier VIP Trust or the EQ Advisors Trust (the 'Trusts').  Your investment results in a variable investment option will depend on the investment performance of the related Portfolio."  Hemr Decl. Ex. 5, at 1 (prospectus for variable annuity contract).

[10]   Hemr Decl. Ex. 3, at Data pages 3-5.

[11]   Id.; see also Hemr Decl. Ex. 5, at 24.

[12]   Hemr Decl. Ex. 3, Data page 5; Ex. 4 ("Endorsement Applicable To Guaranteed Interest Special Dollar Cost Averaging"); Ex. 5, at 32 ("Special dollar cost averaging program").

is a "fund of funds" in the AXA Premier VIP Trust which is itself invested in a mix of portfolios within the EQ Advisors Trust.[13]

2.   **Volatility Management Is Introduced Into Certain Investment Funds Offered To Anne Zweiman And Other AXA Equitable Variable Annuity Contract Holders** *(May-September 2009)*

On May 27, 2009, four new "AXA Tactical Manager" series of portfolios were introduced within the EQ Advisors Trust.[14]  Those portfolios were designed to track well-known equity market indexes except during periods of high volatility, when the portfolio's holdings would be managed to limit equity exposure to the index.  For example, the prospectus for the AXA Tactical Manager 500 portfolio informed investors that:

> During normal market conditions, it is expected that each Portfolio will invest substantially all of its assets in long positions on the S&P 500 Index.  When the models indicate that market volatility is increasing above specific thresholds set for each Portfolio, the Portfolio may limit its exposure to the S&P 500 Index …   This investment strategy is intended to reduce the overall risk of investing in the equity securities of companies represented in the S&P 500 Index, but may result in a Portfolio underperforming that index during certain periods.[15]

This investment strategy of reducing exposure to the market in times of high volatility is generally known as "volatility management," and is referred to in the Complaint as the "ATM Strategy" (for AXA Tactical Manager).  (See Compl. ¶ 1.)

On August 12, 2009, AXA Equitable announced that as of September 1, 2009, the underlying investments for the AXA Conservative-Plus Allocation Portfolio to which Anne Zweiman's account value was allocated could include the AXA Tactical Manager portfolios.[16]

---

[13]   See Hemr Decl. Ex. 5, at 24 ("The AXA Allocation Portfolios … offer contract owners a convenient opportunity to invest in other portfolios that … have been selected for inclusion in the AXA Allocation Portfolios …")

[14]   Hemr Decl. Ex. 6 (prospectus dated May 27, 2009); see also Compl. ¶ 11 ("Sometime between 2009 and 20111 … AXA began implementing the ATM strategy …").

[15]   Hemr Decl. Ex. 6, at 5 ("The Investment Strategy") (emphasis added).

[16]   Hemr Decl. Ex. 7, at 2 (prospectus supplement dated Aug. 12, 2009).

3.     **Anne Zweiman Reallocates All Of Her Account Value
       To Investment Funds Without Volatility Management
       *(February 2010)***

On or about February 19, 2010, Anne Zweiman reallocated all of her account value out of

the AXA Conservative-Plus Allocation Portfolio and into a mix of seven other Investment

Funds.[17]  Those newly-chosen Investment Funds did not use volatility management.  As

Plaintiff's counsel has conceded, " … presumably, the people who opt-out would have no

damages."  (D.E. 25 (Hemr Decl. Ex. 2), at 22:3 (Mr. Feffer).)

4.     **Anne Zweiman Reallocates A Portion Of Her Account Value
       To Two Investment Funds Which Use Volatility Management
       *(June 2013)***

On or about June 21, 2013, Anne Zweiman reallocated about one-third of her account

value out of two Investment Funds that she had chosen in February 2010 and into two other

Investment Funds, "EQ/International Core PLUS" and "EQ/Large Cap Core PLUS."[18]  The

relevant prospectuses informed investors that those portfolios used volatility management.[19]

5.     **Anne Zweiman Dies And Her Executor Commences This Action;
       AXA Equitable Agrees To Specified Relief In A Consent Order Entered By A
       New York State Regulator
       *(March-May 2014)***

On March 15, 2014, Anne Zweiman died.[20]  By that date, she had taken $119,634.03 in

withdrawals from her variable annuity contract and had approximately $210,701.65 in account

---

[17]   Hemr Decl. Ex. 8 (Feb. 19, 2010 transaction confirmation).   The Complaint alleges that underperformance
"during the period 2010 through 2012" was attributable to the use of volatility management, see Compl. ¶ 15,
but omits to disclose that at the very beginning of that three-year period, Anne Zweiman reallocated her account
value to Investment Funds that were not volatility managed.

In February 2011, approximately one year after Anne Zweiman made this reallocation, one of her seven newly-
selected Funds — the "EQ/BlackRock International Value Portfolio" — adopted volatility management.  See
Hemr Decl. Ex. 9.  She did not reallocate account value out of that Fund after she was informed of that change.

[18]   Hemr Decl. Ex. 10 (June 21, 2013 transaction confirmation).

[19]   Hemr Decl. Exs. 11, 12, at 2, 4 (summary prospectuses dated May 1, 2013).

[20]   Death Notice, Anne Zweiman, N.Y. Times, Mar. 17, 2014, at A19.

7

value remaining in her contract.[21]  That total figure of $330,335.68 represents an increase of approximately 35% over her initial contribution of $245,044.40.

On March 17, 2014, AXA Equitable agreed to the entry of a Consent Order by the New York State Department of Financial Services ("DFS").  (Compl. Ex. A.)  That Consent Order set forth "DFS's findings" — which, contrary to the allegation in paragraph 13 of the Complaint, were not agreed to by AXA Equitable — and specified "relief agreed to by DFS and AXA Equitable."  (Id. at 2.)[22]  New York Insurance Law § 4240(e) requires AXA Equitable to file with DFS plans of operation for its separate accounts, and to amend those plans of operation from time to time.  DFS's findings in the Consent Order addressed AXA Equitable's plan of operation filings relating to the use of volatility management in separate account investments.  Specifically, DFS concluded that those filings did not include necessary "detail and discussion":

> The absence of detail and discussion in the filings regarding the significance of the implementation of the ATM Strategy [i.e., volatility management] had the effect of misleading the Department regarding the scope and potential effects of the ATM Strategy on the relevant funds and the possible consequences for policyholders.
>
> DFS approved the filings because it was led to believe that the changes were merely routine additions of funds and similar alterations.  …  Had the Department been aware of the extent of the changes, it may have required that the existing policyholders affirmatively opt in to the ATM Strategy.

(Compl. Ex. A, ¶¶ 8-9.)  Without admitting those findings, AXA Equitable agreed to payment of a civil fine and certain other relief.  (Id. ¶¶ 12 et seq.)  That agreed relief did not include withdrawal of DFS's prior approvals of AXA Equitable's plan of operation filings:  AXA

---

[21]   Hemr Decl. Ex. 13, at 1-2 (Jan.-Mar. 2014 quarterly statement, stating account value as of March 31, 2014).

[22]   AXA Equitable does not adopt the findings of the Consent Order here, but references that exhibit to the Complaint only for purposes of showing the nature of Plaintiff's purported claim.  See Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  In light of the limited nature of the instant motion, AXA Equitable reserves its rights with respect to Plaintiff's effort to rely upon that Consent Order.  See In Re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (Pollack, J.) (striking, pursuant to Fed. R. Civ. P. 12(f), allegations of complaint relying upon "preliminary steps in … administrative proceedings that did not result in an adjudication on the merits").

Equitable had sought and obtained DFS's permission to invest separate account assets in volatility-managed investments, and although DFS criticized those filings, DFS did not withdraw its prior grants of permission or restrict AXA Equitable from offering volatility-managed investments in the future.  Plaintiff contends here that AXA Equitable's purportedly misleading filings with DFS constitute a violation of law in breach of the annuity contract.  (Compl. ¶ 20.)

### PRIOR PROCEDURAL HISTORY

This action is the second putative class action commenced by Jessica Zweiman concerning the same facts.  The first, commenced in this Court on May 2, 2014, was captioned Zweiman v. AXA Equitable, 14-cv-3128 (VSB) (DCF) ("Zweiman I").  (Hemr Decl. Ex. 14.) Zweiman I was one of four putative class actions commenced in this Court by holders of AXA Equitable variable annuities following entry of the Consent Order, the others being O'Donnell v. AXA Equitable, 14-cv-2209 (VSB) (DCF); Swallow v. AXA Equitable, 14-cv-3505 (VSB) (DCF); and Cabral v. AXA Equitable, 14-cv-3715 (VSB) (DCF).  (Hemr Decl. Exs. 15-17.)

Those four complaints alleged, in various ways, that AXA Equitable had failed to make required disclosures to contract holders and had misled DFS regarding the introduction of volatility management.[23]  The complaints in each of those actions also asserted that this Court had subject matter jurisdiction over the action under CAFA, 28 U.S.C. §§ 1332(d) and 1453.  By its order dated June 10, 2014, this Court scheduled an initial conference in all four actions for July 11, 2014.  (Hemr Decl. Ex 18.)

On June 16, 2014, AXA Equitable submitted a letter requesting a pre-motion conference in O'Donnell in anticipation of filing a motion to dismiss that action, including on the ground of lack of subject matter jurisdiction.  That letter pointed out that the O'Donnell action fell within an

---

[23]   See Hemr Decl. Ex. 14 ¶¶ 3, 7, 40, 68(d) (Zweiman I complaint); Ex. 15 ¶¶ 11, 15, 19 (O'Donnell); Ex. 16 ¶¶ 3, 7, 40, 68(d) (Swallow); Ex. 17 ¶¶ 6, 7, 41-42, 50, 58 (Cabral).

exception to CAFA's grant of federal subject matter jurisdiction, including because the variable annuity contract at issue was a "covered security" within the meaning of SLUSA.[24]

On June 19, 2014, in apparent recognition that the force of the subject matter jurisdiction grounds for dismissal of the complaint in the O'Donnell action would similarly apply across all four actions, the plaintiffs in O'Donnell, Zweiman I, Swallow and Cabral voluntarily dismissed their respective actions.  (Hemr Decl. Ex. 20.)  On that same date, Jessica Zweiman commenced this action in the Supreme Court of New York, Westchester County, in which she is jointly represented by plaintiffs' counsel from O'Donnell, Zweiman I, Swallow and Cabral.

On July 3, 2014, AXA Equitable removed the action to this Court pursuant to the removal provision of SLUSA, 15 U.S.C. § 78bb(f)(2).  (D.E. 1.)

## APPLICABLE LEGAL STANDARDS

**1.    SLUSA Precludes Maintenance Of Class Actions Based On Certain State Law Claims Relating To Covered Securities And Requires Dismissal Of Those Actions**

In 1998, in an effort to address "the dangers of maintaining differing federal and state standards of liability for nationally-traded securities,"[25] Congress enacted the Securities Litigation Uniform Standards Act ("SLUSA").  The core provision of that statute precludes certain securities claims arising under state law from being maintained as class actions:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging —
>
> (A)  a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B)  that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

---

[24]   Hemr Decl. Ex. 19, at 1-2 & n.1 (copy of O'Donnell, D.E. 16).

[25]   Dabit, 547 U.S. at 82, citing S. Rep. No. 105-182, at 3 (1998).

15 U.S.C. § 78bb(f)(1).

Plaintiff admits that multiple prerequisites to SLUSA claim preclusion are met here. (D.E. 17, at 6-7.)  In particular, Plaintiff acknowledges that her putative class action is a "covered class action," that her action is "based upon" state law, and that it involves a "covered security," i.e., her variable annuity contract.  (Id. at 7, citing Lander, 251 F.3d at 109).  Plaintiff has also admitted that "if the action is precluded, neither the District Court nor the state court may entertain it, and the proper course is to dismiss."  (D.E. 25 (Hemr Decl. Ex. 2), at 4:8-10 (Plaintiff's counsel Mr. Feffer), quoting Kircher v. Putnam Funds Trust, 547 U.S. 633, 644 (2006).)  And, as explained below, Plaintiff's Complaint alleges omissions of material fact to contract holders (see Part I infra), she acknowledges that her claim is founded on alleged misrepresentations of material facts to DFS (Part II infra), and she alleges use of a "manipulative or deceptive device or contrivance" (Part III infra).

## 2. For Purposes Of SLUSA Claim Preclusion Analysis, Both Variable Annuities And "Accumulation Units" Of The Separate Account Constitute "Covered Securities"

The statutory definition of "covered security" includes "a security issued by an investment company that is registered … under the Investment Company Act of 1940."  15 U.S.C. § 77r(b)(2).  Separate accounts are '40 Act-registered investment companies, and variable annuity contracts must be offered through separate accounts.  For that reason, variable annuity contracts are covered securities.  Lander, 251 F.3d at 105.  For the same reason, Accumulation Units of a separate account are also covered securities.  In Re Mut. Funds Inv. Litig., 437 F. Supp. 2d 439, 443-44 (D. Md. 2006), aff'd, 309 F. App'x 722 (4th Cir.), cert. denied sub nom. Wiggenhorn v. AXA Equitable Life Ins. Co., 558 U.S. 817 (2009) (claims concerning purchases and sales of separate account accumulation units concern "covered securities" under SLUSA).

Accordingly, in this action, not only is Anne Zweiman's variable annuity contract a

"covered security" — as Plaintiff acknowledges (D.E. 17, at 7) — but the Accumulation Units of the Investment Funds of the separate account in which Anne Zweiman's account value was invested are also "covered securities."  SLUSA therefore precludes this Plaintiff from maintaining a putative class action if the action alleges claims involving Anne Zweiman's decision to purchase, hold, or surrender her variable annuity contract as a whole <u>or</u> if the action asserts claims involving Anne Zweiman's decisions to purchase, hold, or sell Accumulation Units within the AXA Equitable separate account.  As explained below, this action does both.

**3.      To Determine Whether A Claim Is Precluded Under SLUSA, Courts Must Apply The "Artful Pleading" Doctrine And "Look Beyond The Face Of The Complaint"**

Ordinarily, the applicability of federal law to a complaint is governed by the "well-pleaded complaint" doctrine.  That doctrine holds that a plaintiff is "master" of his or her complaint and is free to avoid federal jurisdiction by pleading state law claims even where a federal law claim might be available.  <u>Romano</u>, 609 F.3d at 518.  But that mode of analysis does not apply where Congress has specifically provided for the removal of state law claims to federal court, as it did in enacting SLUSA.  <u>See</u> 15 U.S.C. § 78bb(f)(2).  In those instances, courts apply the "artful pleading" rule and "look beyond the face of the complaint" to determine whether the claims asserted are precluded by federal law.

The Second Circuit addressed this issue in <u>Romano</u>, 609 F.3d 512.  In that case, retired employees of two corporations brought putative class actions alleging that they had been mis-advised in connection with their retirement investments and asserting various causes of action under New York law, including claims for breach of contract.  <u>Id.</u> at 516.  The district court held that the employees' actions were precluded under SLUSA, denied the employees' motion to remand and dismissed their claims.  <u>Id.</u> at 517.  The employees appealed, arguing that because they had not pleaded any federal claims the district court was required to hold that

SLUSA provided no federal jurisdictional ground for removal of the action.

Judge Barrington D. Parker, Jr., writing for the panel, affirmed the district court:

> Under the well-pleaded complaint rule … plaintiff is the master of his complaint and is free to avoid federal jurisdiction by "pleading only state claims even where a federal claim is also available."  However, there exists a corollary to the well-pleaded complaint rule — the "artful pleading" rule — pursuant to which plaintiff cannot avoid removal by declining to plead "necessary federal questions."  If the artful pleading rule applies, courts look beyond the face of an "artfully pled" complaint to determine whether plaintiff has "cloth[ed] a federal law claim in state garb" by pleading state law claims that actually arise under federal law.

Id. at 518-19 (citations omitted).

The Second Circuit also noted that because "determining whether [] cases were properly removed under SLUSA is essentially a jurisdictional question," a court assessing whether a complaint is pleading a claim encompassed by SLUSA may look to "materials outside the pleadings," which "can include documents appended to a notice of removal or a motion to remand that convey information essential to the court's jurisdictional analysis."  Id. at 520.

District courts in this Circuit have applied the analysis in Romano to dismiss complaints under SLUSA.  For example, in Montoya v. N.Y. State United Teachers, 754 F. Supp. 2d 466 (E.D.N.Y. 2010), teachers who had invested in a union-sponsored annuity program asserted claim of breach of fiduciary duty against the union based on an allegedly concealed conflict of interest.  Judge Wexler, citing Romano, noted that "the mere refusal of Plaintiffs to refer to their claims as securities violations is not dispositive of the matters before the Court."  Id. at 471. Applying the "artful pleading" rule, he concluded that the teachers' fiduciary duty claim was precluded by SLUSA, because "the factual allegations underlying conduct covered by SLUSA are one and the same as those alleged in support of the fiduciary breach alleged."  Id. at 473; see also, e.g., Tolin v. Standard & Poor's Fin. Servs., LLC, 950 F. Supp. 2d 714, 718-21 (S.D.N.Y. 2013) (applying Romano analysis and granting motion to dismiss pursuant to SLUSA).

13

Other federal courts of appeals have also directed that courts closely scrutinize complaints that raise SLUSA issues.  In <u>Segal v. Fifth Third Bank, N.A.</u>, 581 F.3d 305, 310 (6th Cir. 2009) — an opinion quoted by Judge Parker in <u>Romano</u> — the Sixth Circuit observed:

> Courts may look to — they must look to — the substance of a complaint's allegations in applying SLUSA.  Otherwise, SLUSA enforcement would reduce to a formalistic search through the pages of the complaint for magic words — "untrue statement," "material omission," "manipulative or deceptive device" — and nothing more.  But a claimant can no more elude SLUSA's prohibitions by editing out covered words from the complaint than by disclaiming their presence.  For the same reason a claimant does not have the broader authority to disclaim the applicability of SLUSA to a complaint, he cannot avoid its application through artful pleading that removes the covered words from the complaint but leaves in the covered concepts.
>
> To do otherwise would "frustrate the objectives" of PSLRA and SLUSA, and re-open the "'federal flight' loophole" SLUSA sought to close.

<u>Id.</u> at 310-11 (citations omitted) (quoted in <u>Romano</u>, 609 F.3d at 519-20).  Applying that analysis, the court affirmed the district court's determination that the plaintiffs' claims — although stated as breaches of contract and fiduciary duty — were precluded by SLUSA.

A number of courts assessing whether a state law claim falls within SLUSA's ambit have reviewed a prior complaint filed by the same plaintiff and addressing the same facts to inform their analysis.  For example, in <u>Dudek v. Prudential Securities, Inc.</u>, 295 F.3d 875 (8th Cir. 2002), variable annuity purchasers filed a putative class action in New York state court challenging the marketing of those contracts, but when that action was removed to a court in this District, they voluntarily dismissed that action and re-filed in Iowa state court.  That new state court action was also removed to federal court in Iowa, where it was dismissed as precluded by SLUSA.  The Eighth Circuit affirmed, observing that"[a]lthough plaintiffs deleted the allegations of fraud, misrepresentation, and non-disclosure that permeated their New York complaint, the fact allegations in the two complaints are otherwise essentially the same."  <u>Id.</u> at 879.  In <u>Montoya</u>, Judge Wexler likewise dismissed a complaint as precluded by SLUSA because "[d]espite the fact

that Plaintiffs assiduously avoid[ed] words and phrases using the terms 'manipulative or deceptive device,' 'disclose,' 'disclosure' 'duty to disclose,' or 'omission,' it [was] clear that Plaintiffs' claim of breach of fiduciary duty [was] based upon the alleged existence of a fraudulent scheme."  754 F. Supp. 2d at 473.  That same analysis is instructive here in understanding how Plaintiff selectively edited her Complaint in an attempt to avoid SLUSA preclusion without changing the underlying allegations of wrongdoing.

## ARGUMENT[26]

I.  **PLAINTIFF ALLEGES AN OMISSION OF MATERIAL FACT — *I.E.*, A PURPORTED FAILURE TO NOTIFY CONTRACT HOLDERS OF A "MATERIAL CHANGE" IN THEIR INVESTMENT — AND HER CLAIM IS THEREFORE PRECLUDED BY SLUSA**

   A.  **On Its Face, Plaintiff's Complaint Alleges That AXA Equitable Breached A Provision Of Anne Zweiman's Annuity Contract Requiring Notification To Policyholders Of A "Material Change" In An Underlying Investment, And Thus It Alleges An "Omission Of A Material Fact" Under SLUSA**

Anne Zweiman's annuity contract provides that in the event of a "material change" in investments made by the separate account, AXA Equitable will notify her:

   "If the exercise of these rights [to add, remove, or change Investment Funds] results in a **material change** in the **underlying investment** of a Separate Account, **you will be notified** of such exercise, as required by law."

(Hemr Decl. Ex. 3, Contract page 9, § 2.04 (emphasis added).)   Plaintiff's Complaint twice specifically references this "material change" provision of the contract:

   "Although the policies grant AXA some discretion over investment options, they do not allow AXA to **materially change** such investment options without complying with applicable law."  (Compl. ¶ 10 (emphasis added).)

---

[26]   As the Court directed at the August 6, 2014 conference, this argument addresses only SLUSA claim preclusion. (See D.E. 25 (Hemr Decl. Ex. 2), at 18:16-18.)  AXA Equitable maintains that Plaintiff's claim must be dismissed in its entirety on SLUSA preclusion grounds, but reserves all of its rights to raise other grounds for dismissal of the Complaint should this Court deny this SLUSA preclusion-based motion.

"Implementation of the ATM Strategy **materially changed** the variable annuity products and reduced the value of plaintiff's and the other Class members' variable annuity accounts."  (Id. ¶ 12 (emphasis added).)

By alleging a breach of that contractual notification provision, Plaintiff's Complaint *on its face* alleges an "omission of a material fact" in connection with the underlying investments that Anne Zweiman purchased and sold when allocating and reallocating her account value (i.e., Accumulation Units of the separate account, which are covered securities).  Specifically, Plaintiff's claim contends that as a consequence of AXA Equitable's alleged failure to notify Anne Zweiman and other annuity holders regarding the use of volatility management in particular Investment Funds, those investors either continued to allocate their account value to those Investment Funds rather than (i) reallocating their account value into other Investment Funds available to them, (ii) withdrawing that account value as cash, or (iii) surrendering their annuity contacts entirely.  That putative class action claim is precluded by SLUSA.

The Supreme Court has held that SLUSA encompasses such "holder" class actions.  In Dabit, 547 U.S. 71, the plaintiff claimed that an investment firm's "research analysts … allegedly issued overly optimistic appraisals" of particular stocks, on which the firm's brokers relied, causing "the [firm's] clients and brokers … to hold their stocks long beyond the point when, had the truth been known, they would have sold."  Id. at 75.  The Court, reversing a decision by a panel of the Second Circuit, held that those "holder" class action claims — i.e., putative class actions on behalf of persons who did not sell but continued to hold a covered security in reliance on an alleged misrepresentation or omission — are precluded by SLUSA.  Id. at 86.  So too here: a claim that Anne Zweiman and other contract holders continued to hold Accumulation Units in volatility-managed Investment Funds because AXA Equitable purportedly failed to notify them regarding the use of that strategy is a class action claim precluded by SLUSA.  Indeed, Plaintiff's Motion To Remand does not appear to dispute that that claim is precluded.  (See D.E. 17, at 15.)

**B.      Looking Beyond Plaintiff's Complaint, As The "Artful Pleading"
Rule Provides, Confirms That Plaintiff Seeks To Pursue An Omission
Claim Based On A Purported Failure To Notify Contract Holders**

Under the "artful pleading" rule set forth by the Second Circuit in <u>Romano</u>, the Court

need not confine itself to the Complaint's text, and can "look beyond the face of the …

complaint[] to determine whether [it] allege[s] securities fraud in connection with the purchase

or sale of covered securities."  609 F.3d at 519.  Here, Plaintiff's intention to pursue a claim

against AXA Equitable based on a purported omission in notifying contract holders may be

confirmed by looking to documents beyond her Complaint in at least three different ways:

**<u>First</u>**, a comparison with Plaintiff's prior complaint in this Court shows how she was

selectively edited her new Complaint to delete "magic words" (<u>Romano</u>, 609 F.3d at 520) which

would immediately identify her claim as an omission claim precluded by SLUSA:

| *Prior (<u>Zweiman I</u>) Complaint* | *Present Complaint* |
|---|---|
| "AXA Equitable was required under the terms of variable annuity contracts with Plaintiff and other class members, <u>inter alia</u>, **to … notify the certificate owners** if the exercise of the Company's right to add, change or remove investment options resulted in **a material change** in the underlying investment in a separate account."  (Hemr Decl. Ex. 14, ¶ 60(c)) | "Although the policies grant AXA some discretion over investment options, they do not allow AXA to **materially change** such investment options without complying with applicable law."  (Compl. ¶ 10) |
| "AXA Equitable breached this duty [of good faith and fair dealing] and, without reasonable basis and with improper motive, acted in bad faith by … **failing to notify policyholders of the material change** in **the nature of their investment** and to obtain their approval to remain in funds that applied the Hedging Strategy."  (Hemr Decl. Ex. 14, ¶ 68(d)) | "The effects of the ATM Strategy, however, **altered the very nature of the product** held by plaintiff and other policyholders. Implementation of the ATM Strategy **materially changed** the variable annuity products and reduced the value of plaintiff's and the other Class members' variable annuity accounts."  (Compl. ¶ 12) |

(Emphases added.)  This comparison, like the comparison the Eighth Circuit performed in

<u>Dudek</u>, confirms that although Plaintiff "deleted" the references to notification from her prior

17

complaint, "the fact allegations in the two complaints are otherwise essentially the same."  295 F.3d at 879.

Plaintiff objects to this comparison on the ground that her prior complaint "no longer has any legal effect."  (D.E. 17, at 14.)  As permitted by Romano, the comparison demonstrates how Plaintiff's current Complaint, drafted after being made aware of the potential impact of SLUSA on her prior action and on the prior actions commenced by counsel to the remaining former plaintiffs — all of whom are now her counsel — has attempted to artfully plead around SLUSA preclusion of her omission claim by deleting the word "notify" wherever it expressly asserts a breach of the contractual notification requirement which is triggered by a "material change" in an underlying investment.  Indeed, Plaintiff's redactions implicate precisely the concern identified by the Sixth Circuit in Segal:  "[A] claimant can no more elude SLUSA's prohibitions by editing out covered words from the complaint than by disclaiming their presence."  581 F.3d at 310-11.

Plaintiff further objects to this comparison on the purported ground that the "template" for her current complaint is not her prior complaint in this Court, but rather the complaint in O'Donnell.  (D.E. 17, at 14 n.8.)[27]  But if so, the Court would have to infer that in fashioning her new Complaint, Plaintiff deliberately introduced references to the "material change"/notification contract term that are *nowhere* present in the O'Donnell complaint.  That indicates an intention to pursue a "failure to notify" (i.e., omission) claim, not an intention to abandon that claim.

Plaintiff also points to Beary v. ING Life Ins. & Annuity Co., 520 F. Supp. 2d 356 (D. Conn. 2007) as an example of a case where a plaintiff repleaded a prior complaint and avoided SLUSA preemption.  (D.E. 13.)  In Beary, however, the plaintiff "was careful to remove all such

---

[27]   That claim is doubtful:  this Plaintiff's prior complaint and her current Complaint share distinctive text not present in the O'Donnell complaint.  Compare Compl. ¶ 6 with Hemr Decl. Ex. 14, ¶ 15 ("A variable annuity is a contract between…"); Compl. ¶ 7 with Hemr Decl. Ex. 14, ¶ 18 ("Variable products account for …").  That text is not present in the O'Donnell complaint (Hemr Decl. Ex. 15).

language [i.e., 'allegations of fraud'] from his Amended Complaint," id. at 352, and did not

merely seek to obscure those allegations with selective editing as Plaintiff has done here.[28]   The

plaintiff's counsel in Beary also went so far as to state in open court that plaintiff's claims were

"not founded upon any misrepresentation or omission of any material fact."  Id.   No such far-

reaching stipulation has been offered by this Plaintiff.  (Cf. D.E. 25 (Hemr Decl. Ex. 2), at 25:5-6

(Mr. Haber) ("[There] clearly was a misrepresentation here.  The misrepresentation was [to] the

regulator.  That's clear.  That underlies everything that happened here.").)

     **Second**, Plaintiff's memorandum in support of her Motion To Remand — which she filed

*after* AXA Equitable explained why SLUSA permits removing this action and requires its

dismissal (see D.E. 1, ¶¶ 18-19; D.E. 11, at 2) — purports to assure the Court that "plaintiff does

not assert a claim for breach of any policy provision requiring notice to policyholders."  (D.E.

17, at 13.)  Yet, when describing the breaches of contract that Plaintiff intends to prove in this

action, that memorandum once again expressly references the "material change"/contract holder

notification provision of Anne Zweiman's annuity contract:

> "The annuity contracts required AXA to: […]
>
>     (c)    make any **material changes** in investment options only in
>             compliance with applicable law.
>
> The complaint alleges that AXA breached those provisions of the contracts when it
> unlawfully implemented the ATM Strategy."

(D.E. 17, at 1-2 (emphasis added).)  As she did in her Complaint, Plaintiff carefully omits the

word "notify" when describing this contract provision.

---

28    The repleading efforts of the plaintiffs in Freeman Invs., L.P. v. Pacific Life Ins. Co., 704 F.3d 1110, 1116 (9th Cir. 2013) and Webster v. New York Life Ins. & Annuity Corp., 386 F. Supp. 2d 438, 441 (S.D.N.Y. 2005) (cited at D.E. 17, at 13-14) were similarly successful.  In each of those cases, the repleaded complaint asserted claims based on a dispute over the meaning of contract language, rather than on alleged misrepresentations or omissions:  in Freeman, over the amount of an interest charge, and in Webster, over the amount of a guaranteed interest rate.  Here, the purported contract violations alleged by Plaintiff relate entirely to alleged misrepresentations and omissions to policyholders and DFS.

**Third**, a Freedom Of Information Law ("FOIL") request recently filed by Plaintiff's counsel confirms that Plaintiff intends to pursue an omission claim based on a purported failure to notify.  On or about July 16, 2014, shortly after Plaintiff filed this new Complaint, her counsel filed a FOIL request with DFS, seeking to obtain copies of DFS documents relating to AXA Equitable's communications with policyholders regarding volatility management.[29]  Specifically, that request sought documents concerning:

> "Communications concerning the nature and effect of the ATM Strategy on the accounts of existing variable annuity policyholders ..." (Hemr Decl. Ex. 21, ¶ 6; see also id. ¶¶ 9, 11.)

The efforts by Plaintiff's counsel to seek from DFS documents concerning AXA Equitable's contract holder notifications provide important context for her counsel's assurances that she is not pursuing an "omission" claim based on a failure to notify.[30]  The Court should therefore not remand this action, but should dismiss Plaintiff's claim as precluded by SLUSA.

## II.   PLAINTIFF'S CLAIM IS ALSO BASED ON ALLEGED MISREPRESENTATIONS TO NEW YORK'S DEPARTMENT OF FINANCIAL SERVICES AND IS PRECLUDED BY SLUSA FOR THAT REASON AS WELL

At the August 6, 2014 conference in this action, Plaintiff's counsel readily acknowledged that her claim is based on purported misrepresentations by AXA Equitable to DFS:

> "[Y]our Honor, when SLUSA talks in terms of misrepresentations [there] clearly was a misrepresentation here.  The misrepresentation was [to] the []regulator.  That's clear.  That underlines everything that happened here."[31]

Plaintiff's counsel also acknowledged that the purported misrepresentations to DFS are alleged to

---

[29]   Hemr Decl. Ex. 21.  DFS informed AXA Equitable of that FOIL request for the reason that the request sought documents that AXA Equitable had filed with DFS subject to a request for confidential treatment.  AXA Equitable obtained a copy of that FOIL request by submitting its own FOIL request seeking that document.

[30]   E.g., at the August 6, 2014 conference in this matter, Plaintiff's counsel stated:  "[T]he no notice claim in the original complaint … is completely different than our claim, completely different than the claim, the only claim that now exists in the current complaint."  D.E. 25 (Hemr Decl. Ex. 2), at 10:1-4 (Mr. Feffer).

[31]   Id. at 25:3-7 (Mr. Haber).

be a direct cause of Anne Zweiman's investment in volatility-managed Investment Funds —

"What we know is the regulator approved it because it was deceived"[32]  — and that but for these

alleged misrepresentations, Plaintiff would have no claim:

> "If AXA had gone to the regulators an[d] candidly disclosed what impact the ATM
> strategy would have then we wouldn't be standing here."[33]

Plaintiff contends that those alleged misrepresentations to DFS constitute a violation of law that

is a purported basis for her breach of contract claim.  (Compl. ¶ 20.)  Plaintiff's own

characterizations thus establish that her Complaint presents a paradigmatic example of a claim

alleging "a misrepresentation or omission of a material fact in connection with the purchase or

sale of a covered security." 15 U.S.C. 78bb(f)(1)(A).  SLUSA requires that claim be dismissed.

Plaintiff argues, however, that SLUSA's "'in connection with' requirement is lacking"

(D.E. 17, at 11), noting that Anne Zweiman is not alleged to have relied on misrepresentations

made to DFS.  Accepting that contention would construe SLUSA's "in connection with"

language too narrowly, contrary to Supreme Court precedent.  In <u>Dabit</u>, the Supreme Court

rejected a construction of "in connection with" that would require the prospective purchaser or

seller of securities to have relied personally on a misrepresentation or omission:

> [O]ne might have concluded that an alleged fraud is "in connection with" a purchase
> or sale of securities only when the plaintiff himself was defrauded into purchasing or
> selling particular securities. … <u>But this Court … has rejected that view.</u>  Under our
> precedents, it is enough that the fraud alleged "coincide" with a securities transaction
> — whether by the plaintiff or by someone else.  The requisite showing, in other
> words, is "deception 'in connection with the purchase or sale of any security,' <u>not</u>
> deception of an identifiable purchaser or seller." Notably, this broader interpretation
> of the statutory language comports with the longstanding views of the SEC.

<u>Dabit</u>, 547 U.S. at 85 (citations omitted; emphasis added).  Thus, in its recent decision in

---

[32]   <u>Id.</u> at 23:10-11 (Mr. Haber).

[33]   <u>Id.</u> at 30:7-9 (Mr. Haber).

Chadbourne & Parke LLP v. Troice, 134 S. Ct. 1058, 1066 (2014), the Court observed that "a connection matters where the misrepresentation makes a significant difference to someone's decision to purchase or to sell a covered security."  Here, Plaintiff has acknowledged that the alleged misrepresentations to DFS made a "significant difference" to Anne Zweiman's holding of volatility-managed investments:  had those alleged misrepresentations to DFS not occurred, Anne Zweiman would not have invested in Accumulation Units of Investment Funds that utilized volatility management and would presumably have (i) sold those Units in favor of purchasing Accumulation Units of some other Investment Fund, (ii) sold those Units and withdrawn cash from her variable annuity contract, or (iii) surrendered her annuity contract in its entirety.

A federal district court in Chicago considered very similar allegations in Rabin v. JPMorgan Chase Bank, N.A., No. 06-C-5452, 2007 WL 2295795 (N.D. Ill. Aug. 3, 2007). There, beneficiaries of trust accounts that had invested in a mutual fund asserted that they were injured by misrepresentations that the defendants had made to the SEC in seeking approval of the fund:

> Plaintiffs maintain that in furtherance of its scheme, Defendants misrepresented and omitted material facts to the [SEC] on Defendants' Registration Statements.  Had the SEC known the [facts], Plaintiffs contend that the SEC would have prevented the Registration Statements from becoming effective and Defendants would have been unable to sell shares of the Fund.

Id. at *1.  The plaintiffs argued that their claims were not precluded under SLUSA because they personally "did not purchase or sell shares of the Fund in response to the misrepresentations and omissions."  Id. at *7.  Citing Dabit, the court held that that argument misconstrued SLUSA:

> [I]n rejecting this same argument, Dabit focused on the conduct of the defendants rather than the identity of the plaintiffs.  Plaintiffs contend that Defendants engaged in a scheme to invest proceeds from the beneficiaries' accounts into Defendants' proprietary mutual fund despite better suited options, through misrepresentations and omissions of material facts in Defendants' public filings and other disclosures. Despite the fact that they did not purchase, sell, or hold the shares, Plaintiffs have alleged fraud that occurred "in connection with the purchase or sale" of the Fund.

Id.  Here, just as in Rabin, the Plaintiff contends that "the regulator [i.e., DFS] approved"

particular investments "because it was deceived,"[34] and that that alleged deception caused Anne Zweiman to hold Accumulation Units of those investments, even though she did not make her investment allocation decisions based on a personal review of AXA Equitable's filings with DFS. See also In Re LIBOR-Based Fin. Inst. Antitrust Litig., 935 F. Supp. 2d 666, 729 (S.D.N.Y. 2013) (in addition to misrepresentations to plaintiffs, alleged "phony statements" to banking association "qualify as having been made 'in connection with' the purchase or sale of securities").

Plaintiff further asserts that the "in connection with" requirement is not met here because Anne Zweiman's purchase of her variable annuity contract occurred before AXA Equitable's alleged misrepresentations to DFS, and thus those misrepresentations do not "coincide" with her purchase of that contract. (D.E. 17, at 10-11.)  That contention ignores that not only is the annuity contract a "covered security," but the Accumulation Units of the separate account — which Anne Zweiman purchased and sold when she allocated or reallocated her account value or took withdrawals from her contract  — are also "covered securities" within the meaning of SLUSA (see pp. 11-12 supra).  Anne Zweiman's investment decisions to hold or to sell Accumulation Units of volatility-managed Investment Funds, as well as her decision to hold or to surrender her annuity contract in its entirety, did not arise until after DFS had approved the AXA Equitable plan of operation filings authorizing the offering of those volatility-managed Investment Funds.[35]  Those misrepresentations and omissions alleged by Plaintiff "coincide" with those ongoing investment decisions by Anne Zweiman.  See Dabit, 547 U.S. at 85.[36]

---

[34]   D.E. 25 (Hemr Decl. Ex. 2), at 23:10-11 (Mr. Haber).

[35]   Plaintiff's reliance on Stephens v. Gentiello, 853 F. Supp. 2d 462, 470 (D.N.J. 2012) (D.E. 17, at 11), in which discovery established that an alleged misrepresentation about an optional annuity contract rider was made after the annuity contract was purchased, is therefore unavailing.

[36]   Likewise, this is not a case where a defendant contends that a plaintiff's breach of contract claim is precluded by SLUSA on the theory that the contract itself contains misrepresentations.  (Cf. D.E. 17, at 8-9 (citing cases).)  Here, Plaintiff's claim is precluded by SLUSA because she alleges misrepresentations and omissions subsequent

*(cont'd)*

**III.   PLAINTIFF'S CLAIM IS ALSO PRECLUDED BY SLUSA
FOR THE REASON THAT IT ALLEGES THAT AXA EQUITABLE USED
A "MANIPULATIVE OR DECEPTIVE DEVICE OR CONTRIVANCE"**

Plaintiff's Complaint alleges that AXA Equitable deceived DFS and implemented

volatility management "for the sole purpose of reducing AXA's exposure to market volatility —

the very risks policyholders paid AXA to assume."  (Compl. ¶ 11.)  Such claims asserting self-

interested manipulation or deception have been held to allege "a manipulative or deceptive

device or contrivance" within the meaning of SLUSA.  15 U.S.C. § 78bb(f)(1)(B).

For example, in <u>Montoya</u>, teachers who had invested in a union-sponsored annuity

program asserted fiduciary duty claims against the union based on an allegedly concealed

conflict of interest.  Judge Wexler dismissed the claims as precluded by SLUSA:  "Plaintiffs here

allege the classic use of a manipulative or deceptive device, aimed here at increasing the

payment of fees, rather than fulfillment of the duty to provide objective investment advice."  754

F. Supp. 2d at 473, <u>citing</u> <u>Felton v. Morgan Stanley Dean Witter & Co.</u>, 429 F. Supp. 2d 684

(S.D.N.Y. 2006).[37]   Here, Plaintiff alleges that AXA Equitable deceived DFS in order to cause

contract holders to remain invested in a volatility-managed Investment Fund, for its own benefit

and to the detriment of contract holders.  That alleges a "manipulative or deceptive device or

contrivance," 15 U.S.C. § 78bb(f)(1)(B), and renders her claim precluded by SLUSA.

Similarly, in <u>Dudek</u>, purchasers of annuity contracts alleged that an insurer had sold them

_____

*(cont'd from previous page)*
to purchase of her contract that purportedly affected her post-purchase investment allocation decisions.

[37]   Plaintiff seeks to distinguish <u>Montoya</u> and <u>Felton</u> on the ground that "those cases involved express allegations of a fraudulent scheme or material misrepresentations or omissions."  (D.E. 17, at 9 n.5.)  That is incorrect. Both of those cases apply "artful pleading" analysis to claims couched in terms designed to avoid SLUSA preclusion.  That Plaintiff does not expressly allege AXA Equitable "intended" (<u>see</u> D.E. 17, at 8, 11) to commit a fraud is of no weight here:  SLUSA does not include a <u>scienter</u> requirement.  <u>Winne v. Equitable Life Assurance Soc'y of U.S.</u>, 315 F. Supp. 2d 404, 413 (S.D.N.Y. 2003) ("The argument that SLUSA preempts only state-law claims alleging scienter must fail because no language in the statute supports it.").

"'inherently unsuitable and inappropriate' tax-deferred annuities."  295 F.3d at 879.  The Eighth

Circuit held that those claims were precluded by SLUSA not only because plaintiffs had alleged

the misstatement or omission of material facts, but also because "fairly read, [their] complaint

alleges that defendants 'used or employed [a] deceptive device or contrivance in connection with

the purchase or sale of a covered security.'"  Id. at 880, citing 15 U.S.C. § 78bb(f)(1)(B).  For the

same reasons, Plaintiff's claim here is precluded by SLUSA and must be dismissed.[38]

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Complaint should be dismissed with prejudice and

Plaintiff's Motion To Remand (D.E. 16) should be denied.

Dated:   New York, New York
         September 5, 2014

                                        Respectfully submitted,


                                        */s/ Jay B. Kasner*
                                        Jay B. Kasner (Jay.Kasner@skadden.com)
                                        Kurt Wm. Hemr (Kurt.Hemr@skadden.com)
                                        Tansy Woan (Tansy.Woan@skadden.com)
                                        SKADDEN, ARPS, SLATE,
                                           MEAGHER & FLOM LLP
                                        Four Times Square
                                        New York, New York  10036
                                        Phone:  (212) 735-3000

                                        *Attorneys for Defendant AXA Equitable*
                                           *Life Insurance Company*

---

[38]   Plaintiff also argues that her claim should not be characterized as sounding in fraud because she "does not seek special damages" but only "benefit of the bargain damages."  (D.E. 17, at. 9.)  Yet, "benefit of the bargain" damages are the usual remedy for federal securities fraud claims.  McMahan & Co. v. Wherehouse Entertm't, Inc., 65 F.3d 1044, 1050 (2d Cir. 1995).  Plaintiff is actually seeking more relief than she would be entitled to if she had brought a fraud claim under New York law, as New York law does not provide "benefit of the bargain" damages to fraud claimants who (like Anne Zweiman) do not suffer out of pocket losses.  Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373-74 (1996).